IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 110,149

STATE OF KANSAS,
*Appellee*,

v.

RALPH E. COREY,
*Appellant.*

SYLLABUS BY THE COURT

1.

K.S.A. 22-3423(1)(c) permits a trial court to declare a mistrial if there was prejudicial conduct inside or outside the courtroom that makes it impossible to proceed without injustice to a defendant or the prosecution. To follow the statute, a trial court must engage in a two-step analysis. It must (a) decide whether there was some fundamental failure of the proceeding, and (b) if so, determine whether it is possible to continue without an injustice. This second step requires assessing whether the damaging effect of any prejudicial conduct may be removed or mitigated through an admonition, jury instruction, or other action. If that is not possible because the degree of prejudice would result in an injustice, a mistrial is necessary.

2.

An appellate court reviews a trial court's decision denying a motion for mistrial under an abuse of discretion standard. A district court abuses its discretion when its action is: (a) arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (b) based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (c) based on an error of fact, *i.e.*,

1

if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based.

3.

Appellate review of a mistrial issue considers two questions: (1) Did the trial court abuse its discretion when deciding whether there was a fundamental failure in the proceeding? and (2) Did the trial court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice?

4.

To determine if a nonconstitutional error makes it impossible to proceed with the trial without injustice and requires a mistrial, a court must assess whether the fundamental failure affected a party's substantial rights under K.S.A. 60-261 and K.S.A. 60-2105. But if the error implicates a constitutional right under the United States Constitution, the effect of that error must be assessed under the constitutional harmless standard in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967).

5.

Under *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), an error may be declared harmless when the party benefitting from the error proves beyond a reasonable doubt that the error will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, when there is no reasonable possibility the error contributed to the verdict. An appellate court will use the same analysis to review the trial court's determination regarding constitutional harmless error.

6.

An appellate court reviews a prosecutorial misconduct claim alleging improper comments using a two-step analysis. First, the appellate court decides whether the comments were outside the wide latitude a prosecutor is allowed, *e.g.*, in discussing evidence. If so, there was misconduct. Second, if misconduct is found, the appellate court determines whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial.

7.

Appellate courts consider three factors in determining when prosecutorial misconduct so prejudiced a jury against a defendant that a new trial should be granted: (a) whether the misconduct was gross and flagrant; (b) whether the misconduct showed ill will on the prosecutor's part; and (c) whether the evidence against the defendant was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the juror's minds. And while none of these factors individually controls, and before the third factor can override the first two, an appellate court must be able to say the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), have been met.

8.

A criminal defendant has a constitutional right to be present at all critical stages of that defendant's trial. A conference between a trial judge and a jury is considered a critical stage of a trial.

9.

When a defendant's right to be present is violated, an appellate court determines whether the error requires reversal by applying the constitutional harmless error standard.

Review of the judgment of the Court of Appeals in an unpublished opinion filed November 14, 2014. Appeal from Franklin District Court; ERIC W. GODDERZ, judge. Opinion filed July 1, 2016. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, argued the cause, and *Lydia Krebs*, of the same office, was on the brief for appellant.

*Natalie Chalmers*, assistant solicitor general, argued the cause, and *James T. Ward*, deputy county attorney, *Josh Smith*, deputy county attorney, *Stephen A. Hunting*, county attorney, and *Derek Schmidt*, attorney general, were on the briefs for appellee.

The opinion of the court was delivered by

BILES, J.:  Ralph Corey challenges his convictions for aggravated kidnapping, attempted rape, criminal threat, and two counts of aggravated sexual battery. He raises two additional sentencing issues. The convictions stem from a February 2000 sexual assault in Ottawa that had no suspect until January 2011 when DNA profiles pointed toward Corey, who by then was incarcerated in an Arizona federal correctional facility. His first trial ended in a postconviction mistrial due to jury misconduct. A second trial resulted in his convictions. The Court of Appeals affirmed. *State v. Corey*, No. 110,149, 2014 WL 6490503 (Kan. App. 2014) (unpublished opinion).

As this case reaches our court on petition for review, we must decide:  (1) whether reversal is required because jurors learned during their deliberations that Corey had been tried previously for the crimes; (2) whether the prosecutor argued facts outside the evidence and misstated the law of attempt, and if so whether reversible error occurred; (3) whether three other undisputed trial court errors require reversal; and (4) whether cumulative error requires reversal. We must also decide whether the district court erred by relying on Corey's criminal history to increase the sentence for his primary crime of

4

conviction without that criminal history having been proven to a jury. And, finally, Corey has filed a motion for summary disposition arguing his aggravated kidnapping sentence is illegal based on *State v. Murdock*, 299 Kan. 312, 319, 323 P.3d 846 (2014), *overruled by State v. Keel*, 302 Kan. 560, 357 P.3d 251 (2015). As explained below, we affirm Corey's convictions and sentences and deny the motion.

We hold that the jury misconduct was harmless beyond a reasonable doubt based upon our review of the entire record. We further hold all trial errors were harmless beyond a reasonable doubt—both individually and cumulatively. As to the criminal history claim, we have repeatedly rejected it since *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002), and will not revisit that holding in this appeal. See, *e.g.*, *State v. Foster*, 290 Kan. 696, 699, 233 P.3d 265 (2010). Finally, we deny Corey's motion because his illegal sentence argument was resolved by *Keel*, which overruled *Murdock*.

FACTUAL AND PROCEDURAL BACKGROUND

In February 2000, 16-year-old L.H. was abducted as she left work. An assailant ran up as she was getting into her car, hit her, and pushed his way inside. He put L.H. in the back seat, pulled a stocking cap over her head to cover her eyes, threatened to kill her if she called out, and then drove to a nearby parking lot. The assailant got into the back seat with L.H., lifted her bra, and fondled her breasts.

As he began to pull down her pants, she resisted. The attacker removed or partially removed his pants and rubbed his genitals against her stomach. He asked how old she was, and she told him. She later testified the assailant "responded like he was shocked" and stopped. He told her he would take her back, to be quiet, and that he would not hurt her if she did as she was told. He then fondled her breasts and masturbated before driving to another location. There, he fondled her breasts again, but stopped and said he knew

5

who she was, where she worked, and that he would come back and hurt her if she told anyone what happened. When he left, L.H. notified the police, describing her assailant as a male of medium build with dark hair and a mustache.

Investigators found the stocking cap and a pair of gloves in the back of L.H.'s car. Partial DNA profiles were obtained from the cap and one glove, and a full profile was taken from the other glove. Each profile was consistent with the same individual, but not the victim. A partial male DNA profile was also developed from a swab of L.H.'s stomach. Latent fingerprints inside the car did not match either L.H. or Corey.

The full profile from the glove was entered into the FBI's Combined DNA Index System, but it was not until 2011 when authorities matched it to Corey, who was by then in federal custody. He denied involvement with the crime and said he had never been to Kansas.

The State charged Corey with aggravated kidnapping, attempted rape, criminal threat, and two counts of aggravated sexual battery. He was tried and convicted, but the district court granted an unopposed motion for new trial after it was learned a juror had used a cell phone during deliberations to access information about the case and shared it with the jury.

Our focus is on the second trial, where the attention was on the attacker's identity. L.H. described him as a white male with dark hair and a mustache, who was approximately 5'8" tall with a medium build. She said his voice was strong and gruff, and had a flat, Midwestern accent. She testified he wore dark blue jeans, a dark top, and a long-sleeved jacket. She admitted only glimpsing the assailant's face and could not identify him from photo lineups or in the courtroom.

Tammy Smith, who was waiting for L.H. in the parking lot where the abduction occurred, testified she had parked her car so that she could see her friend walk out. She noticed a white male wearing a heavy black coat and black stocking cap move quickly behind her car. He was about 6' tall or a little shorter, had a mustache, and dark eyebrows. She said he got close enough to her driver's door that she could have touched him if the window had been open. The man left abruptly after she put her car in gear. She did not see L.H. walk out, but later observed a car similar to L.H.'s leaving the parking lot, driven by someone who appeared to be the same man who approached her car. Smith identified that man as Corey.

Shortly after the attack, L.H. and Smith independently cooperated with a sketch artist who produced composite drawings of the man based on their descriptions. They agreed at trial those sketches accurately reflected their recollections. The drawings were admitted into evidence, as were photographs of Corey taken in 2002 and 2011.

The State also presented evidence about Corey's employment at the time of the attack as an over-the-road truck driver for companies based in Iowa and Arizona. Records showed Corey bought fuel in Waterloo, Iowa, the day before the attack and in Hewitt, Texas, the day after. The State showed these cities were close to Interstate 35, which passes through Ottawa.

At trial, the State's experts testified Corey could not be excluded as a contributor to the DNA profiles from the swab of L.H.'s stomach, the stocking cap, and the gloves. The estimated probability of randomly selecting an unrelated male from the general population with the partial DNA profile from the stomach swab was approximately 1 in 9. But the partial profile from the left glove had an estimated frequency in Caucasians unrelated to Corey of 1 in 7 billion, while the partial profile from the cap had an

7

estimated frequency of 1 in 12 trillion, and the full profile from the right glove had an estimated frequency of 1 in 62 trillion.

The expert who testified about the hat and gloves admitted that the presence of Corey's DNA on the clothes left by the attacker did not prove Corey was the person who used the items the night of the attack. Corey testified in his own defense, denying any involvement.

Corey admitted it was possible he travelled Interstate 35 between Waterloo and Hewitt as a trucker, but would consider it a normal route travelling north, rather than south. He said most of his runs from Waterloo headed east, typically driving to St. Louis, then Oklahoma City and Dallas. He agreed his equipment included gloves, boots, and stocking caps and that the gloves in evidence were commonly used in the trucking industry. He said the hat and gloves were consistent with what he would have used around the time of the attack, but did not specifically remember owning them. He explained that hats and gloves are frequently left at places such as rest areas and truck stops and commonly transferred from one driver to another. He estimated he had gone through 50 to 75 pairs of gloves in 20 years.

The defense attacked the State's evidence on various fronts. Corey argued he was not the attacker because he had a strong east-coast accent, rather than a Midwestern one, as L.H. had described. He also noted he had tattoos on his forearms at the time of the assault and L.H. did not notice any tattoos on her attacker. And while she testified the attacker was wearing a coat, she also admitted on cross-examination that she had previously said the assailant wore a short-sleeved t-shirt and his arms could be seen. On redirect, she said she had never stated that she had seen the attacker's bare arms.

Corey also challenged Smith's in-court identification by pointing out that Smith had initially told police the man in the parking lot only got within about 12 feet of her, which was contrary to her testimony. Corey's counsel suggested Smith had told another officer that the closest the man got was 30 feet away.

As to the DNA evidence, the defense presented Dean Stetler, a University of Kansas molecular biosciences professor, who testified about shortcomings in the State's DNA analysis. He explained that the results linking Corey to the hat and gloves were unreliable because of sloppy lab work, as evidenced by the State's inability to document exactly what was done during the sampling and inaccurate dates shown in the evidence submitted to him. Along this line, Corey elicited admissions from the KBI employee who did initial DNA testing on the hat and gloves that her work habits had been questioned by her supervisor, who had characterized her administrative documentation as inadequate and sloppy. At trial, that employee admitted her supervisor had alleged she falsified dates during her employment and proposed to demote her before she resigned.

Stetler further testified there was a possibility the DNA profile from the stomach swab was inaccurate because of cross-contamination with a positive control profile used in the analysis. He said the partial profile from the swab was consistent with the positive control and that it might have come from that, rather than the swab. Stetler noted the positive control matched the profile from the swab better than Corey's DNA because the partial profile did not exhibit one of two alleles found in Corey's DNA.

Finally, Stetler observed that the DNA evidence did not prove Corey was present at the attack and it was possible Corey had only been in earlier contact with the items. He said it was also possible the attacker did not leave any DNA on the mouth area of the stocking cap—the area from which that particular profile was developed—if he wore the cap as a beanie. He said if kept dry, a person's DNA can remain forever.

9

The jury convicted Corey. He was sentenced to imprisonment for 272 months for the aggravated kidnapping, 59 months for attempted rape, 32 months for each aggravated sexual battery conviction, and 6 months for criminal threat, with all sentences running consecutively, for a controlling sentence of 401 months of imprisonment. He timely appealed and the Court of Appeals affirmed. *State v. Corey*, No. 110,149, 2014 WL 6490503 (Kan. App. 2014) (unpublished opinion).

Corey timely petitioned for review, which we granted. Jurisdiction is proper. K.S.A. 60-2101(b) (review of court of appeals decision); K.S.A. 20-3018(b) (procedure for obtaining review).

JUROR MISCONDUCT

Corey claims the district court erred when it denied his motion for mistrial made when it was discovered the jury discussed his first trial. The Court of Appeals agreed there was a fundamental failure in the proceedings but held that curative instructions mitigated any harm. *Corey*, No. 110,149, 2014 WL 6490503, at *8-9. Corey argues the panel applied the wrong test and should have reversed his convictions. To correctly resolve the arguments, we must understand what happened, as well as the proper standard for appellate review.

*Additional Facts*

During deliberations, the court bailiff heard a juror comment that this was a retrial. The bailiff alerted the trial judge, who asked the jurors to stop deliberating until he could talk to the parties. While in chambers, the bailiff told the judge and parties that a juror had reported that another juror said this was a retrial and thought the bailiff should know.

10

The juror also asked how that affected deliberations. The bailiff said most of the jurors were present when the retrial comment was discussed. The judge and parties agreed to break for the weekend and decide what to do when the trial reconvened.

When the trial resumed, Corey requested a mistrial or, in the alternative, an instruction to explain that: each jury is sovereign, both parties submitted evidence not submitted to the last jury, and that the jury is not permitted to consider any prior proceeding to determine whether the State met its burden of proof. The State opposed a mistrial, arguing knowledge of a prior proceeding was insufficient to strike a prospective juror for cause during voir dire, so the question at this stage should be whether the jury could set aside knowledge of a retrial and base its decision on the evidence. The State agreed a curative instruction could be given. In response, Corey acknowledged it was unclear whether the jury knew the previous trial resulted in a conviction, but he also recognized the extent of the jury's knowledge could not be discovered without further "poisoning the well." He said his requested curative instruction assumed the worst.

The district court agreed that not knowing if the jury was aware of the prior conviction was problematic, but it was also hesitant to delve further into that with the jurors. The court forecast that as soon as there were questions about what the jury heard and how that information may be affecting their thinking, the first thing the jury would talk about when deliberations resumed would be the retrial.

Ultimately, the court denied the mistrial, finding there was an insufficient showing of actual or substantial prejudice. But it agreed to give a curative instruction and assembled the jury. The court explained it was giving two additional instructions based on concerns that arose before the weekend break. First, it instructed that it was the court's duty to explain the law pertinent to the case and that the jury's duty was to consider and follow those instructions and decide the case by applying them to the facts as found by

11

the jury. Second, and based on a modification of PIK Crim.3d 51.04, the court told the jury:

> "In your fact findings you should consider and weigh everything admitted into evidence. This includes testimony of witnesses, admissions or stipulations of the parties, and any admitted exhibits. You must disregard any testimony or exhibit which I did not admit into evidence. *The jury is not to consider any prior proceedings for purposes of determining whether the State has met its burden of proof in this case*." (Emphasis added.)

On appeal, Corey argued the district court erred in giving the additional instructions rather than declaring a mistrial. In rejecting this, the panel acknowledged the district court's analytical path was flawed but determined reversal was not warranted because "we agree with the district court that the curative instruction mitigated any harm caused by the jury misconduct." *Corey*, 2014 WL 6490503, at *8-9. On review to this court, Corey notes the panel applied an incomplete analysis.

We agree the panel incorrectly considered the issues presented but hold nonetheless that the jury misconduct was harmless beyond a reasonable doubt based on our review of the entire record. We start with the applicable test in its full form.

*Standard of Review*

A trial court may declare a mistrial if prejudicial conduct, inside or outside the courtroom, makes it impossible to proceed without injustice to either the defendant or the prosecution. See K.S.A. 22-3423(1)(c). This sets out a two-step process for the trial court's consideration. First, it must determine if the proceeding suffered some fundamental failure. If so, the second step is to assess whether the trial can continue without an injustice, *i.e.*, whether the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action. If not, the trial

12

court must determine whether the degree of prejudice results in an injustice. If so, the court declares a mistrial. *State v. Harris*, 297 Kan. 1076, 1086-87, 306 P.3d 282 (2013); see *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

An appellate court reviews the trial court's ruling on a motion for mistrial for abuse of discretion. *Harris*, 297 Kan. at 1087. The appellate court's inquiry is separated into two parts: (1) Did the district court abuse its discretion when deciding if there was a fundamental failure in the proceeding? and (2) Did the district court abuse its discretion when deciding whether the conduct caused prejudice that could not be cured or mitigated through jury admonition or instruction or other means, resulting in an injustice? *Ward*, 292 Kan. at 551. Judicial discretion is abused when judicial action is (1) arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. 292 Kan. at 550.

The fundamental failure analysis varies with the nature of the alleged deficiency, *i.e.*, whether it is based on a witness' actions, a bystander's actions, prosecutorial error, or an evidentiary error. 292 Kan. at 551.

When determining if a fundamental failure made it impossible to proceed without injustice, a court must assess whether the failure affects a party's substantial rights—in other words, whether it will or did affect the trial's outcome. 292 Kan. at 565, 569. "The degree of certainty by which the court must be persuaded that the error did not affect the outcome of the trial will vary depending on whether the error implicates a right guaranteed by the United States Constitution." 292 Kan. at 565. If it does not, the court

13

will use the statutory harmless error standard of K.S.A. 60-261 and K.S.A. 60-2105. If it does, the court will use the constitutional harmless error analysis of *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967). 292 Kan. at 569; see *State v. Santos-Vega*, 299 Kan. 11, 23-24, 321 P.3d 1 (2014).

"An appellate court reviewing the second step for an injustice will review the entire record and use the same analysis . . . ." *Ward*, 292 Kan. at 570. Put differently, the appellate court's review is a harmlessness inquiry, even though abuse of discretion has been articulated as the nominal standard of review. See *Santos-Vega*, 299 Kan. at 26-27 (reviewing denial of mistrial motion, assessing district court's decision on injustice prong by analyzing whether error was harmless to degree of certainty applicable to constitutional errors).

The level of certainty in the trial's outcome required under the nonconstitutional and constitutional harmless error tests are distinct. See *State v. Herbel*, 296 Kan. 1101, 1110, 299 P.3d 292 (2013). For nonconstitutional error, the [trial] court applies K.S.A. 60-261 and determines "'if there is a reasonable probability the error did or will affect the outcome of the trial in light of the entire record.'" 296 Kan. at 1110 (quoting *Ward*, 292 Kan. 542, Syl. ¶ 6). But for constitutional error, the court applies the test articulated in *Chapman*, under which an error may be declared harmless only when it is demonstrated beyond a reasonable doubt the error will not or did not affect the trial's outcome in light of the entire record, *i.e.*, when there is no reasonable possibility the error contributed to the verdict. 296 Kan. at 1109-10. Under either test, the party benefitting from the error bears the burden of demonstrating harmlessness. 296 Kan. at 1110; *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012) (nonconstitutional error); *Ward*, 292 Kan. at 568-69 (constitutional error).

14

*Discussion*

In Corey's case, the district court did not make an explicit finding that the juror's comment about a retrial constituted a fundamental failure, but the Court of Appeals did. The panel noted juror misconduct ordinarily occurs when a jury considers matter outside the evidence and the issues in the case and that the information about a retrial in Corey's case was a matter completely outside the evidence. *Corey*, 2014 WL 6490503, at *8, citing *State v. Leaper*, 291 Kan. 89, 238 P.3d 266 (2010). See *Saucedo v. Winger*, 252 Kan. 718, 724, 850 P.2d 908 (1993); *State v. Fenton*, 228 Kan. 658, 664, 620 P.2d 813 (1980). Implicit in the panel's decision is a determination that the district court abused its discretion by not explicitly finding a fundamental failure in the proceedings.

The State has not disputed the panel's conclusions up to this point in the analysis, and we agree there was a fundamental failure in the proceedings based on the undisputed facts and the caselaw noted. The problem lies with what follows because the panel did not consider what harmless error standard was applicable given the nature of the fundamental failure. Instead, it simply stated:  "[W]e agree with the district court that the curative instruction mitigated any harm caused by the jury misconduct." *Corey*, 2014 WL 6490503, at *9.

Jury misconduct under these circumstances must be viewed under the *Chapman* constitutional harmless error standard. "In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. Louisiana*, 379 U.S. 466, 472-73, 85 S. Ct. 546, 13 L. Ed. 2d 424 (1965) (reversing conviction when sheriff's deputies in charge of jury while it was sequestered also testified against defendant at the trial, in part because nothing in record

showed what deputies discussed with the jurors after their testimony). "Jury exposure to facts not admitted during trial violates the sixth amendment right to trial by jury by permitting evidence to reach the jury which has not been subjected to confrontation or cross-examination and to which counsel has not had the opportunity to object or request a curative instruction." *Lacy v. Gardino*, 791 F.2d 980, 983 (5th Cir. 1986); see *Gamache v. California*, 562 U.S. 1083, 1084, 131 S. Ct. 591, 178 L. Ed. 2d 514 (2010) (denying certiorari) (suggesting *Chapman* applied when deliberating jury given access to videotape not admitted at trial); *United States v. Saya*, 247 F.3d 929, 937 (9th Cir. 2001) (applying harmless error standard to jury's discussion of extrinsic evidence during deliberations when defendant framed issue as violation of his Confrontation Clause rights).

Corey argues there was a reasonable possibility the jury misconduct affected its verdict, noting that a jury's awareness of a defendant's prior conviction for the same crime has been determined to be highly prejudicial. He relies on two Nevada cases: *Winiarz v. State*, 107 Nev. 812, 820 P.2d 1317 (1991), and *Hui v. State*, 103 Nev. 321, 738 P.2d 892 (1987). But in both, the juries learned the previous proceedings resulted in convictions, while the record in Corey's case does not disclose if the jury learned of the conviction in the first trial.

The *Winiarz* court plainly draws this distinction and cites an Arizona case, *State v. Hansen*, 156 Ariz. 291, 295-96, 751 P.2d 951 (1988), in which a juror remarked during deliberations that the trial was the defendant's second with the first ending in a mistrial, although the juror did not know the previous verdict. The Arizona Supreme Court agreed a new trial was unwarranted because the discussion about the prior trial was short and the jury did not know the previous verdict. The court held: "Such a brief and inconsequential conversation was hardly prejudicial to [the defendant]." 156 Ariz. at 295. See also *Williams v. State*, 494 A.2d 1237, 1242 (Del. 1985) (prosecutor inadvertently referenced

16

defendant's prior trials, but this was not prejudicial because knowledge of that fact does not lead to conclusion that they ended in convictions).

At trial, Corey endorsed the district court's decision not to probe further into the jury's knowledge about the previous trial and there is no evidence Corey attempted to ascertain that information after the second trial. Just as importantly, Corey alternatively recommended giving curative instructions, which Corey's counsel said assumed the worst possibility, *i.e.*, actual jury knowledge about the prior trial's outcome. The trial court gave those instructions, and appellate courts presume juries follow the instructions given. *State v. Kettler*, 299 Kan. 448, 478, 325 P.3d 1075 (2014).

Finally, the evidence was overwhelming. The only issue was whether Corey was the person who committed the crimes. In that regard, the State presented: (1) strong DNA evidence linking Corey to the stocking cap and gloves found in the back of the victim's vehicle; (2) weaker DNA evidence associating Corey to the DNA sample taken from the victim's stomach; (3) eyewitness testimony identifying Corey at the scene; (4) additional eyewitness testimony consistent with Corey being the attacker; and (5) Corey's fuel records demonstrating his opportunity to commit the crimes.

We hold based on our review of the entire record that the jury misconduct was harmless beyond a reasonable doubt. Therefore, neither the district court's failure to determine whether the misconduct was a fundamental failure in the proceeding, nor the panel's failure to apply the appropriate legal standard when analyzing the injustice prong entitles Corey to a new trial. See *State v. Wycoff*, 303 Kan. 885, 886, 367 P.3d 1258 (2016) (appellate court can affirm district court if it was right for the wrong reason).

17

Corey next argues reversible prosecutorial misconduct occurred during closing arguments when the prosecutor said: (1) Corey's DNA was found on the victim's body; and (2) the reason the assailant stopped the attack did not matter in deciding the attempted rape charge. The panel held that the prosecutor did not misstate the evidence or the law. *Corey*, 2014 WL 6490503, at *25.

*Standard of Review*

Appellate review of a prosecutorial error claim based on improper comments requires a two-step analysis. First, an appellate court decides whether the comments at issue were outside the wide latitude a prosecutor is allowed, *e.g.*, when discussing evidence. If so, there was error. Second, if error is found, an appellate court determines whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 (2013).

Appellate courts consider three factors in analyzing the second step: (1) whether the error was gross and flagrant; (2) whether the error showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the jurors' minds. But none of these factors individually controls; and before the third factor can override the first two, an appellate court must be able to say the harmlessness tests of both K.S.A. 2015 Supp. 60-261 and *Chapman*, 386 U.S. at 24, have been met. *McCullough*, 293 Kan. at 990-91.

When both constitutional and nonconstitutional errors clearly arise from the same acts and omissions, an appellate court begins with a harmlessness analysis of the constitutional error. If the constitutional error is reversible, an appellate court need not

18

analyze whether the lower standard for harmlessness under K.S.A. 2015 Supp. 60-261 also has been met. *Bridges*, 297 Kan. 989, Syl. ¶ 16. Under both standards, the party benefiting from the error bears the burden to demonstrate harmlessness. *Herbel*, 296 Kan. at 1110.

*References to DNA on the Victim's Body*

The prosecutor referred to the DNA found on L.H.'s body in several statements during the main and rebuttal portion of closing arguments: (1) "From the belly swabs comes the DNA of this defendant. The defendant, he cannot be excluded." (2) "Now remember when the belly swab was compared to the defendant it was 1 in 9 individuals." (3) "His DNA shows up on her belly. His DNA shows up on the gloves. His DNA shows up on the hat. And in addition, one of the eyewitnesses from that night pointed to him and said that's the guy." (4) "Ladies and Gentlemen, this case you've got more than circumstantial evidence. You've got actual scientific evidence that places his DNA on items left at the scene and his DNA on her body."

The panel held it was a reasonable inference to draw from the evidence that the DNA recovered from the victim's stomach was Corey's. The panel found persuasive *State v. Young*, No. 106,451, 2013 WL 1339873 (Kan. App. 2013) (unpublished opinion), which held it was fair comment to argue that DNA belonged to defendant when evidence showed probable frequency of profile among individuals of defendant's race of 1 in 9,280 and because the victim identified the defendant as the perpetrator, the defendant was driving the same car as the perpetrator, and the defendant lived out-of-state but was near the crime scene on the day it was committed. *Corey*, 2014 WL 6490503, at *23-24.

The problem is that the statistical match between Corey's DNA and the DNA recovered from L.H.'s stomach was not as conclusive as the prosecutor represented, most

19

particularly in the statement: "You've got actual scientific evidence that places his DNA on items left at the scene and his DNA on her body." The partial DNA profile from the stomach swab was consistent with Corey's DNA profile, but the estimated probability of randomly selecting an unrelated male from the general population with the same partial DNA profile was 1 in 9. We cannot conclude from this that the "actual scientific evidence" placed Corey's DNA on the victim's body. Such comment was error.

But this error was not gross and flagrant or the product of ill will. The circumstances do not suggest the prosecutor deliberately set out to misstate the evidence. See *Bridges*, 297 Kan. at 1016. Though the rule against stating facts outside the evidence is longstanding, there was a significant amount of evidence from which to infer the DNA belonged to Corey. *Cf.* 297 Kan. at 1014 (gross and flagrant misconduct when prosecutor said defendant's friend did not help defendant install a water heater, when the friend actually testified he did).

Moreover, while the prosecutor said more than once that the stomach swab contained Corey's DNA, the prosecutor also reminded the jury the DNA profile could be found in 1 in 9 individuals. Additionally, it does not appear the jury was unduly swayed by this because it asked a question during deliberations about the DNA analysis from the belly swab and the appropriate witness testimony was read back. Finally, the remaining evidence against Corey was overwhelming, *i.e.*, his DNA found on clothing left behind by the attacker, the eyewitness descriptions, and his opportunity to commit the crimes as demonstrated by his fuel logs.

*The Law of Attempted Rape*

Corey next argues the prosecutor misstated the law of attempt by arguing the jury could not acquit based on the assailant's voluntary abandonment of the attempted rape.

20

The panel rejected this claim, citing *State v. Morfitt*, 25 Kan. App. 2d 8, 956 P.2d 719 (denying voluntary abandonment as a defense to the charge of attempt to commit a crime when defendant committed an overt act toward the perpetration of the crime), *rev. denied* 265 Kan. 888 (1998).

The prosecutor told the jury:

"Ladies and Gentlemen, for the purposes of the attempted rape charge, it doesn't matter why he stopped. From a legal standpoint, the fact is when he tried to unbutton her pants and actually did undo her pants and tried to pull them down and was clearly trying to have sex with her, he has done more than just mere preparation in attempting to rape somebody. He is in the act of trying to rape them and from a legal standpoint it does not matter as to why he stopped.

"For whatever reason, when she told him her age he stopped. It doesn't matter why. It's enough that he did all the things that he did and clearly his intent was obvious based upon all the kissing and fondling, when it was done to the victim, [L.H.]."

Under the attempt statute in effect at the time of the crimes: "An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 1999 Supp. 21-3301(a). Relying on dictionary definitions of the terms "fail," "prevent," and "intercept," Corey argues the statute can be reasonably interpreted to require a defendant's failure to complete the intended crime must be due to some reason other than voluntary abandonment. Therefore, he argues, the rule of lenity requires the court to construe the statute in his favor.

But controlling precedent forecloses Corey's argument. In *State v. Martinez*, 290 Kan. 992, 1007, 236 P.3d 481 (2010), the court held the attempt statute offered

21

alternatives to the prosecution in establishing attempted rape, explaining that the State could produce evidence the defendant was "prevented or intercepted" in executing the crime, or demonstrate there was a failure to perpetrate the crime. The court held the victim's testimony that Martinez stopped touching her genitals was "sufficient to justify the jury's verdict" and that the State was not required to prove "someone or something prevented" the defendant from completing the crime. 290 Kan. at 1007. And it noted it had previously described "proof of this element in the context of attempted rape as simply showing the defendant 'failed to penetrate the [victim's] sexual organ . . . .'" 290 Kan. at 1007.

*Martinez* demonstrates that the reason the intended crime did not occur is irrelevant because the fact that the completed crime did not occur is sufficient in itself. Therefore, Corey's argument that the crime must fail to occur for some reason other than the defendant's voluntary abandonment is without merit. As a result, his claim that the prosecutor misstated the law fails.

THREE ADDITIONAL TRIAL ERRORS

Next, Corey challenges the panel's determination that three additional trial errors were harmless. They are: (1) The district court judge's ex parte communication with the jury; (2) the record's failure to reflect that Corey was present during critical stages of the trial, specifically a discussion about a jury question and a testimony readback; and (3) instructions given concerning the costs of a mistrial due to juror misconduct. We consider these individually and hold each is harmless. We will address the cumulative issue separately.

22

During the discussion between the court and the parties about the jury's discovery of the first trial, the judge disclosed on the record and with Corey and counsel present:

> "So I went back there and uh, when I went back there they were talking again, and I just asked them to stop until I had a chance to talk with counsel. I told them to take a break, not to deliberate any further, just relax for a little bit until I had a chance to talk with you all which they were happy with.
>
> "And uh, I did ask who the foreman was and uh, it appeared that the lady that the rest of them had selected wasn't happy being foreman. Primarily she thought she was going to have to read the verdicts out loud in court. I do not have them do that. I do that. So she was okay with going ahead and being the foreman at that point, but it's [B.R.], who is the actual jury foreman. She's the lady on the back row, second one in. Anyway, that's what's going on. So I don't know if counsel have any comments or any thoughts on how to proceed?
>
> "I did not ask any more questions about this comment about a retrial or anything of that nature."

Corey's counsel then asked for time to speak with Corey, and the judge replied, "If you want to talk about that, five or ten minutes. I'll tell the jury we're talking about it and relax for another ten minutes." It does not appear Corey objected to the judge returning to the jury room. After the recess, the judge advised the parties:

> "I told the jurors that counsel were in here and discussing the matter. I didn't tell them what I told you all. The juror foreman told that they wanted to know how long they could deliberate. One of them did. It wasn't the juror foreman but the jury foreman butted in and said what she means is can we come back a different day. We're completely exhausted. We want to come back another day if we're too tired to continue today.

23

"I told them jury deliberations can continue as long as you all want. I don't have a rule cutting you off at a certain time. That if that ends up being the case so be it, but I told them I was still talking to counsel and would be back in a minute and that's when I came back in here."

The panel held the district court violated Corey's right to be present at all critical stages of his trial, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution by entering the jury room and talking with jurors outside his presence. *Corey*, 2014 WL 6490503, at *15. The State does not dispute this determination, and "'[i]t is well settled that a conference between a trial judge and a juror is a critical stage of the trial at which a criminal defendant has a constitutional right to be present.'" *State v. Killings*, 301 Kan. 214, 241, 340 P.3d 1186 (2015) (quoting *State v. Mann*, 274 Kan. 670, 682, 56 P.3d 212 [2002]); *State v. McGinnes*, 266 Kan. 121, 127, 967 P.2d 763 (1998).

When a defendant's right to be present is violated, an appellate court determines whether the error requires reversal by applying the constitutional harmless error standard. *State v. Verser*, 299 Kan. 776, 789, 326 P.3d 1046 (2014). In doing so, the court utilizes four factors:

"'(1) the overall strength of the prosecution's case; (2) whether an objection was lodged; (3) whether the ex parte communication concerned a critical aspect of the trial or rather involved an innocuous and insignificant matter, and the manner in which it was conveyed to the jury; and (4) the ability of a posttrial remedy to mitigate the constitutional error.'" 299 Kan. at 789-90 (quoting *Herbel*, 296 Kan. at 1111).

The panel held the ex parte communications were harmless because (1) the State's case was strong, particularly in light of the DNA evidence; (2) Corey did not object to them; (3) the conversations were not about a critical aspect of the trial; and (4) Corey did

not pursue any posttrial remedies to mitigate the error. *Corey*, 2014 WL 6490503, at \*15-17.

The only challenge Corey mounts to the panel's analysis is that the evidence was not overwhelming. Specifically, he relies on his expert testimony calling the DNA evidence into question, variations in the eyewitness accounts over the years, and the testimony about Corey's tattoos and accent contradicting the victim's testimony.

Our review of the four *Verser* factors leads us to agree with the panel's conclusion that this error was harmless beyond a reasonable doubt. As discussed, the prosecution's case against Corey was strong and Corey overstates the strength of his challenges to the State's case. The defense DNA expert did not attack the State's experts' conclusions about the evidence from the hat and gloves because they were arrived at through flawed methodology. Instead, he testified the conclusions were unreliable because of alleged shoddy recordkeeping. And as to the stomach swabs, the defense expert merely suggested cross-contamination was a possibility for the results. The testimony about the tattoos is of little import given the victim's equivocation on whether she even saw the attacker's arms. In addition, the contemporaneous police sketches and fuel records point to Corey as the guilty party as well.

Second, Corey did not object to the ex parte communications when the district court alerted the parties they had occurred. Third, the judge's communications did not concern a substantive aspect of the trial. He simply told the jury to stop deliberating and informed the foreperson that he, not the foreperson, would read the verdict in the courtroom. "Reversal is unwarranted when the information communicated outside the defendant's presence is so vanilla." 299 Kan. at 790. Fourth, Corey did not raise the error in his motion for new trial.

25

Based on the entire record, we conclude the ex parte communication by the judge was harmless beyond a reasonable doubt.

*Corey's Absence from the Jury Question Discussion and Readback*

This issue arises because after deliberations resumed following the weekend break, the jury submitted a question, asking: "On the 3 belly swabs, does the Y[-]STR DNA test prove that the defendant has the same DNA as 1 in 9 male individuals in the world? [O]r does that mean 1 in 9 within the defendant[']s lineage?" The parties agreed the most prudent response was to read back the testimony of the witness who discussed the stomach swab DNA comparison. The court agreed and arranged the readback.

The record is silent whether Corey was present for this discussion or the actual readback, so Corey argued for the first time on appeal that the district court violated his right to be present at all critical stages of his trial. In response, the State conducted an ex parte hearing with the district court while the case was on appeal to secure a district court determination that the trial transcript was inaccurate when it failed to show Corey's presence during the chamber's conference and the subsequent readback.

The panel noted the ex parte hearing by the district court while the case was on appeal was "problematic" because Corey and his counsel were not present and the district court was without jurisdiction while the case was on appeal. It determined it must decide the appeal based only on the original trial transcript. *Corey*, 2014 WL 6490503, at *11. The panel then held it would presume the defendant's constitutional right to be present at all critical stages of the trial was violated based on the original transcript's failure to confirm Corey's attendance at the proceedings in question and determined the error harmless beyond a reasonable doubt. 2014 WL 6490503, at *12-13. The State did not cross-petition for review, and we see no reason to question the panel's determinations.

26

See Rule 8.03(h)(1) (2015 Kan. Ct. R. Annot. 78) (review includes all issues properly before Court of Appeals that petition or cross-petition allege were erroneously decided); see also *Killings*, 301 Kan. at 241 (right to be present at conference between judge and jury); *State v. Herbel*, 296 Kan. 1101, 1107-08, 299 P.3d 292 (2013) (court will presume defendant not present when record does not affirmatively reflect presence).

Corey's only argument is with the conclusion that the error was harmless, based on the panel's determination that the evidence of guilt was overwhelming. Based on the *Verser* factors, we agree the error was harmless beyond a reasonable doubt. The readback added nothing new to the evidence, the entire testimony was read, and there is no allegation the readback was inaccurate. In addition, the evidence was overwhelming, Corey's counsel did not raise any objection during the chamber's conference or the readback based on the lack of Corey's presence, and Corey did not pursue any posttrial remedies. So while we acknowledge the jury's question and the readback were both substantive and critical to the State's case because it went to the strength of the only DNA evidence directly placing Corey at the scene at the time of the crimes, we hold the discussion of the jury question and readback of testimony outside Corey's presence was harmless beyond a reasonable doubt.

JURY INSTRUCTIONS ABOUT CONSEQUENCES OF A MISTRIAL

Corey next argues his convictions must be reversed because the district court twice told the jury that a mistrial would result in expense and inconvenience to the court, the parties, and the taxpayers. The first occurred just after the jury was selected. The trial court gave a preliminary instruction stating in part:

> "You must not engage in any activity, or be exposed to any information, that might unfairly affect the outcome of this case. Any juror who violates these instructions

27

I've explained to you jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over. As you can imagine, a mistrial is a tremendous expense and inconvenience to the parties, the Court and the taxpayers."

The second came when the district court released the jury for the weekend after learning about the misconduct. It told the jury it had already given an instruction that, to ensure a fair verdict, it was necessary the jurors not be exposed to outside information about the case, law, or issues in the case, especially during deliberations. The court stressed this admonishment still applied and warned them not to try to get information from any other source before resuming deliberations. The court further explained:

"The reason it's so important, Number One [*sic*], it's important because this trial is important to both of the parties. The State's concerned that they have a fair trial. Mr. Corey is concerned that he gets a fair trial in this particular case. And any information or any discussions or the things I've already mentioned can jeopardize that.

"It's also important to the Court, because if there is any of this type of activity it could result in a mistrial *which means we would have to try this thing again. There would be 12 more of you selected and another cost associated with that for a week long jury trial*. So it's important—I can't just stress it enough." (Emphasis added.)

Corey did not object to the preliminary instruction or the admonishment, but for the first time on appeal claims they were error and require reversal of his convictions. The panel agreed both instructions were error, relying on *State v. Salts*, 288 Kan. 263, 200 P.3d 464 (2009), but held the errors did not require reversal. On review, the State does not contest those holdings.

28

*Standard of Review*

When reviewing jury instructions for error, an appellate court first considers reviewability from jurisdiction and preservation viewpoints, which it does de novo. Next, the court exercises unlimited review to determine whether the instruction was legally appropriate. Then, it considers whether the evidence taken in the light most favorable to the defendant supports the instruction. And, finally, if there was error, the court determines whether it was harmless, using the test and degree of certainty set out in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011). *State v. Moyer*, 302 Kan. 892, 914-15, 360 P.3d 384 (2015).

If, as here, the appellant failed to properly object to the instruction, the standard on appeal is whether the instruction was clearly erroneous. 302 Kan. at 915. To find clear error, the court must be firmly convinced the jury would have reached a different verdict absent the instructional error. See *State v. Pfannenstiel*, 302 Kan. 747, 753, 357 P.3d 877 (2015).

*Discussion*

This case's procedural posture creates an unusual circumstance because after the panel issued its decision, a majority of this court held a similar preliminary instruction given at the beginning of trial did not constitute error. See *State v. Tahah*, 302 Kan. 783, 795, 358 P.3d 819 (2015), *cert. denied* 136 S. Ct. 1218 (2016). But absent a properly raised challenge to the panel's error determination, we are confined to reviewing the panel's holding that the verdict would not have been different absent the preliminary instruction and admonishment. See *Corey*, 2014 WL 6490503, at *21; Rule 8.03(h)(1).

Like the panel, we are not firmly convinced there is a real possibility the jury would have reached a different verdict absent the preliminary instruction and admonishment. We need look no further than *Tahah* to conclude the preliminary instruction did not influence the jury's verdict:

> "An *Allen* instruction risks coercing a unanimous verdict by unduly influencing jurors to compromise their views on the evidence simply to avoid a hung jury. . . .
>
> "The preliminary jury instruction here, however, is not an *Allen* instruction. Its character and purpose are entirely different. The instruction occurred at the start of trial, before the presentation of evidence, and warned jurors of the dangers of a mistrial resulting from their own misconduct. As such, its coercive effect (to prevent juror misconduct) is entirely proper and justified." 302 Kan. at 794-95.

We need not decide, but question in light of the majority view in *Tahah* whether the admonishment was error. But assuming it was, we are faced with Corey's argument that the admonishment might have caused a compromise verdict because it could infer the consequences of a mistrial from juror misconduct might also be the consequences of a hung jury. We are not firmly convinced this is what happened because "[n]othing in the record demonstrates the jury was near deadlock, deadlocked, pressured to reach a verdict, or concerned about the implications of another trial." *State v. Warrior*, 294 Kan. 484, 515, 277 P.3d 1111 (2012) (affirming conviction despite *Salts* error because there was substantial evidence of guilt and defendant did not explain why instruction made difference in deliberations); see *Salts*, 288 Kan. 263 (jury would not have reached different verdict despite erroneous instruction that jury's failure to reach decision would leave charges undecided, State would decide whether to resubmit to different jury, and another trial would be burden on both sides).

30

There is evidence of some disharmony in the jury room before the weekend break, but the record does not disclose the source. Before deliberations resumed, the district court instructed the jury to base its decision on the instructions and evidence admitted at trial. In turn, that evidence pointed strongly to Corey's guilt: his DNA on items at the scene, eyewitness descriptions consistent with his appearance, DNA consistent with his on the victim, and his presence along Interstate 35 as an over-the-road trucker in cities north and south of Ottawa in the days before and after the crime.

Even assuming error, the preliminary instruction and admonishment were not clearly erroneous.

## CUMULATIVE ERROR

Corey next argues cumulative error denied him a fair trial. We have identified or presumed the following errors: (1) Juror misconduct from discussion about the first trial during the second trial; (2) prosecutorial error in stating Corey's DNA was found on the victim; (3) the district court's ex parte conversation with the jury; (4) Corey's presumed absence during the discussion about a jury question and readback of testimony; and (5) the preliminary jury instruction and admonishment warning about the burdens of having to restart the trial after a mistrial caused by juror misconduct.

> "The test for cumulative error is '"whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant."' *State v. Edwards,* 291 Kan. 532, 553, 243 P.3d 683 (2010) (quoting *State v. Ellmaker,* 289 Kan. 1132, Syl. ¶ 12, 221 P.3d 1105 [2009])." *State v. Williams*, 303 Kan. 585, 604, 363 P.3d 1101 (2015).

When applying this test, if any of the errors being cumulated are constitutional in nature, their cumulative effect must be harmless beyond a reasonable doubt. In assessing the totality of the circumstances,

> "an appellate court examines the errors in the context of the record as a whole, considering how the district court dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence." *State v. Tully*, 293 Kan. 176, 205-06, 262 P.3d 314 (2011) (citing *Ward,* 292 Kan. at 569-70, 578).

The panel reviewed these factors and held cumulative error did not require reversal. But the panel did not consider the jury misconduct in its analysis. Doing so in our analysis, we reach the same result because the errors do not overtake the strength of the evidence against Corey. There was no reversible cumulative error.

MOTION FOR SUMMARY DISPOSITION

The final issue arises on a motion for summary disposition Corey filed while his petition for review was pending in this court. He argues the district court erred calculating the criminal history score used to determine his aggravated kidnapping sentence because it scored a pre-1993 out-of-state felony conviction as a person felony. He relies on *State v. Murdock*, 299 Kan. 312, 319, 323 P.3d 846 (2014), *overruled by State v. Keel*, 302 Kan. 560 (2015), which held pre-1993 out-of-state felony convictions must be scored as nonperson felonies.

We will assume without deciding that Corey's motion was a proper procedural vehicle to raise this issue. Compare K.S.A. 22-3504(1) ("The court may correct an illegal sentence at any time."), with Kansas Supreme Court Rule 7.041(b) ("During the

32

pendency of an appeal, a party may move for summary disposition, citing a controlling appellate decision that is *dispositive of the appeal*." [Emphasis added.]) (2015 Kan. Ct. R. Annot. 67).

We must deny Corey's motion because we have since held "the classification of a prior conviction . . . as a person or nonperson offense for criminal history purposes is determined based on the classification in effect for the comparable Kansas offense at the time the current crime of conviction was committed." *Keel*, 302 Kan. at 590. Corey does not argue the district court erred in ascertaining the comparable Kansas offense when scoring the pre-1993 conviction.

Affirmed.