NOT DESIGNATED FOR PUBLICATION

No. 120,127

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

RALPH E. COREY,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Franklin District Court; ERIC W. GODDERZ, judge. Opinion filed July 26, 2019. Affirmed.

*Joseph A. Desch*, of Law Office of Joseph A. Desch, of Topeka, for appellant.

*David R. Huckabee*, assistant county attorney, *Brandon L. Jones*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., MALONE and GARDNER, JJ.

LEBEN, J.: After Ralph Corey's convictions for aggravated kidnapping, aggravated sexual battery, and criminal threat were upheld on appeal, he brought a habeas corpus action claiming that inadequate representation by his trial attorney had led to his convictions. The district court held an evidentiary hearing on Corey's claim, hearing testimony from the attorneys who represented Corey at trial and in his direct appeal and from Corey. The district court then denied relief to Corey.

It's important to recognize, as we'll explain in more detail later in the opinion, that there was no question that someone had committed the vicious crimes involved here. The only question was, who did it?

Corey was identified years after the crimes by DNA evidence. Corey was an over-the-road truck driver who didn't live anywhere near Ottawa, Kansas, where these crimes took place. But fuel-purchase receipts his attorney brought forward showed that he had bought fuel in Iowa the day before the crime and in Texas a day after. That left a likely route for the trucker to have gone to Ottawa on I-35. And Corey argues that this and other errors by his attorney constituted inadequate representation and led to his conviction.

But the district court found that the trial attorney's "representation of his defense was not deficient in any way." And that's supported by the attorney's testimony that Corey wanted the attorney to use court subpoenas to get the fuel records even though the attorney warned him that the State would learn whatever the records said—and the information would thus be coming in at trial no matter what it said. To obtain relief, Corey had to prove not only that his attorney provided inadequate representation but also that the poor representation affected the trial's outcome. On that second requirement, the district court held that "[e]ven if it could be argued that there was any error [by the attorney], it would not rise to the level that there is a reasonable probability of a different outcome at trial." We agree, and we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

With that overview, let's go into more detail about the case and the arguments Corey has raised on appeal. We will discuss only the most important facts to provide context for the issues of this appeal; a more detailed factual background can be found in the decisions of our court and the Kansas Supreme Court in Corey's direct appeal. See

2

*State v. Corey*, 304 Kan. 721, 724-27, 374 P.3d 654 (2016); *State v. Corey*, No. 110,149, 2014 WL 6490503, at \*1-7 (Kan. App. 2014) (unpublished opinion).

The crimes took place on February 19, 2000, in Ottawa. Sixteen-year-old L.H. worked at the Walmart there, and she had planned to go on a double-date that evening with her friend Tammy. But Tammy, waiting in the Walmart parking lot for L.H. to get off work, got spooked by a man coming toward her car and quickly moved it to another part of the parking lot. She then met up with the two boys she and L.H. were planning to meet. Tammy didn't see L.H. come out of the Walmart, but she saw a car that looked like L.H.'s leave the parking lot. It was driven by a white man with dark hair and facial hair, though, not by L.H. Eventually, Tammy and the boys left.

L.H. had left the store and gone to her car in the employee parking lot. Just as she was about to put her car into reverse, she saw something in the mirror. Then a man ran up and hit her car window with his open hand, opened the door, and punched her in the face. He hit her several times and forced his way into the car.

The man pushed her into the backseat and drove away—putting a stocking mask onto her head and obscuring her vision. When she asked where he was taking her, he told her to shut up or he would kill her. He went to a nearby parking lot and got into the backseat. He lifted up her sweater, shirt, and bra; he touched her breasts as she struggled and told her to shut up. He unbuttoned her pants and tried to pull them down, but she resisted. He then simulated sex, with his penis touching her stomach, and asked if she wanted sex. When she said no, he asked her age. When he learned she was only 16, he stopped what he was doing. She thanked him, but he then touched her breasts and masturbated. And then he took her to another parking lot and touched her breasts again.

3

Finally, he told her he knew where she worked and that he would come back to hurt her if she told anyone. He left and told her to count to 100 before she got out of the car.

When she got out, she called her mother. The two went to the local sheriff's office and reported what had happened. Officers found what they believed was pubic hair in her clothing and took DNA swabs from her stomach. They also found a stocking cap and a pair of gloves in L.H.'s car.

L.H. and Tammy met with a sketch artist, who worked from their recollections— L.H. of what she'd seen during the attack and Tammy of the man she'd seen in the parking lot. Investigators also were able to get partial DNA profiles from the cap and a glove, and they got a full DNA profile from the other glove. Each profile was consistent with a single person but not L.H. A partial profile was also developed from the sample taken from L.H.'s stomach.

But even though they had DNA evidence, the investigation soon floundered. The DNA information was entered into a national FBI database, but no matches came back.

A decade later, in 2011, a DNA sample in the FBI's database came back as a match. The DNA belonged to Corey, then serving a federal prison sentence. Corey denied any involvement in the attack on L.H., but after further investigation the State charged him.

Corey was twice convicted on all charges by a jury. After the first trial, the district court learned that the jury had done some independent research during deliberations, so the court declared a mistrial. A second jury also convicted Corey on all charges, and the district court sentenced him to a controlling term of 401 months in prison.

Corey's convictions and sentences were affirmed on direct appeal. *Corey*, 2014 WL 6490503, *aff'd* 304 Kan. 721. He then filed his habeas corpus claim. Although it raised several issues, the only claim being pursued on appeal is that his trial attorney, John Boyd, provided inadequate representation. The district court determined that Boyd provided appropriate representation and that "[e]ven if it could be argued there was any error, it would not rise to the level that there is a reasonable probability of a different outcome at trial."

ANALYSIS

The only claim Corey presents in this appeal is that his trial attorney provided inadequate representation. To gain relief on that claim, he must show two things: (1) that his attorney's performance was below the constitutionally required minimum level of competence and (2) that the inadequate performance prejudiced his defense. To show prejudice, Corey must convince us that there's a reasonable probability the jury would have reached a different result had the representation been adequate. See *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014).

Because the district court held an evidentiary hearing, we look first to see whether its factual findings are supported by substantial evidence. We independently review its legal conclusion of whether the representation, based on the facts found by the district court, was adequate. 300 Kan. at 881; *State v Adams*, 297 Kan. 665, 669, 304 P.3d 311 (2013). To the extent that the district court's factual findings don't specifically address one of the specific claims Corey makes on appeal about Boyd's representation, we note that no request was made to the district court to make additional findings after it issued its 14-page ruling. In that situation, we presume the district court would have made any additional findings that would have supported its judgment if they were supported by substantial evidence. *State v. Combs*, 280 Kan. 45, 50, 118 P.3d 1259 (2005).

For most of the claims Corey presents about Boyd's representation, extended discussion here isn't required for two reasons. First, the district court didn't find any inadequacy, and its finding is supported by the evidence. Second, with only one exception (the fuel-receipts issue we'll discuss separately), Corey hasn't shown how any of these claims reshaped the trial. The district court also concluded that even if one were to assume error, the alleged errors wouldn't have affected the trial's outcome. That conclusion is also supported by the record here—and we note that the judge who heard the evidence at this habeas hearing was the same judge who presided over the trial. The judge who presided over both the trial and a habeas hearing is in the best possible position to determine whether adequate representation was provided and what may have affected the trial's outcome. See *Wilkins v. State*, 286 Kan. 971, 988, 190 P.3d 957 (2008); *Chamberlain v. State,* 236 Kan. 650, 659-60, 694 P.2d 468 (1985).

Setting aside the fuel-receipts evidence, Corey argues that Boyd's preparation for the trial was inadequate in these ways:

- He didn't research the parking-lot lighting in place in 2000;
- He didn't interview L.H. outside court proceedings;
- He didn't adequately cross-examine L.H. and Tammy; and
- He didn't adequately prepare Corey for his trial testimony.

The district court didn't see any of these as failures that left the representation constitutionally inadequate, and we agree.

Perhaps more information about the parking-lot lighting could have helped in the cross-examination of L.H. and Tammy. But we don't know that because Corey didn't present information about the lighting conditions at the habeas hearing. His point about lighting is mere speculation. And the cross-examination of L.H. and Tammy was effective in showing several inconsistencies.

Inconsistencies aren't surprising, though, when a witness talks at first to the police and then testifies at a series of court hearings; even for a truthful witness, it's hard to have all the details line up. The jury obviously thought those inconsistencies were caused more by the gap in time from a 2000 crime to a 2012 trial than by some basic inaccuracy from the witnesses. And while Boyd didn't talk with L.H. before the preliminary hearing (though there's also no evidence she would have been willing to talk with him), the district court found Boyd was adequately prepared for trial based on the ability to question her at the preliminary hearing. Of course, Boyd also had a chance to fully cross-examine both L.H. and Tammy at the first jury trial. So by the time of the second trial, the one that created the convictions that remain in place and are now at issue, Boyd had substantial preparation for the cross-examination of both witnesses. In addition, as the district court said, "With the petitioner's DNA located in the mask, gloves and from the victim's body, cross examination could only accomplish so much."

The district court didn't specifically address the claim that Boyd didn't adequately prepare Corey to testify. Boyd and Corey had different recollections about their work together preparing for Corey's testimony. But the district court must have generally accepted Boyd's testimony about that and found the preparation adequate given the court's overall conclusions about Boyd's work:

> "In this case, trial counsel's performance was reasonable and competent. There is no evidence of deficient conduct by petitioner's trial counsel. The Court is unaware of what else counsel could have done in his representation of the petitioner either before trial or during trial. The representation of his defense was not deficient in any way."

We will discuss the fuel-receipts issue separately because it's the one alleged deficiency that might have affected the trial's outcome. The fuel receipts showed Corey in Iowa the day before the attack and Texas the day after—in locations along or near I-35. Those receipts were found because of defense efforts, not as part of the law-enforcement

7

investigators. Corey argues that his attorney should not have worked to discover information that helped the State's case against him.

But Corey ignores Boyd's testimony about how the records came to be discovered and produced. Boyd said that Corey proposed getting the fuel receipts to prove his innocence and show that he wasn't at the parking lot during the attack. The company that had employed Corey as a truck driver in 2000 had gone out of business, so records couldn't readily be obtained from that company. Boyd was also concerned that even if records could be obtained, it would be hard to get a records custodian to authenticate them. Boyd also had another consideration; he wanted to be able to get the records into evidence without Corey's testimony to preserve the option that Corey might not testify at trial. So Boyd said he discussed the evidentiary issues with Corey and that Corey agreed to permit Boyd to get the records from the credit-card company with a court subpoena and enter into a stipulation with the State that the records could be admitted at trial without the testimony of a records custodian. Boyd said he told Corey that if they used this approach, they would get the records, but the State would still be able to use them if they weren't helpful to the defense. Boyd said Corey agreed to that plan and wanted Boyd to pursue the fuel receipts.

As we now know, although Corey told Boyd the records would help the defense, that didn't turn out to be the case. But the district court credited Boyd's testimony on this as accurate; otherwise it would have been hard for the court to say that it found that the representation "was not deficient in any way." Boyd's testimony supports that conclusion on the process used to get the fuel receipts.

Even if we presume that a defense attorney should not get records that might prove problematic through a joint investigation with the State (and even with the client's consent), Corey still would have to show that this impacted the trial's outcome. The district court judge who had presided over the trial concluded that "[e]ven if it could be

8

argued there was any error [by Boyd], it would not rise to the level that there is a reasonable probability of a different outcome at trial." We agree.

We must consider the fuel-receipts evidence in the context of the other evidence presented. The State's DNA expert witness testified that the chance of the left-glove DNA being from a Caucasian unrelated to Corey to be 1 in 7 billion. He said the same chances were 1 in 12 trillion for the DNA on the cap and 1 in 62 trillion for the full DNA-profile material found on the right glove. The partial DNA found on the stomach swab had a 1 in 9 chance of being from an unrelated male. So how did that DNA get there if Corey wasn't the attacker? His explanation wasn't convincing:

> "Corey's only explanation for how his DNA was found on the hat and gloves was that he used many pairs of gloves over the years as a trucker and that the gloves frequently were left behind or transferred from driver to driver. However, no one else's DNA was discovered on the hat and gloves left behind in L.H.'s vehicle." *Corey*, 2014 WL 6490503, at \*26.

Overall, then, the DNA evidence was powerful. And despite some inconsistencies, Tammy identified Corey as the man she had seen that night, and the jury had a chance to see the composite sketch as well as photos of Corey.

In its decision in Corey's direct appeal, the Kansas Supreme Court considered whether a jury-misconduct error in his second trial that implicated Corey's constitutional rights had had any impact on the trial's outcome. For an error involving constitutional rights, a more-stringent test for determining the effect on the trial outcome applied: the State had to show that the error was harmless beyond a reasonable doubt. Even under that higher standard, the Kansas Supreme Court found in the direct appeal that any error was harmless because the evidence against Corey was so strong:

"[T]he evidence was overwhelming. The only issue was whether Corey was the person who committed the crimes. In that regard, the State presented: (1) strong DNA evidence linking Corey to the stocking cap and gloves found in the back of the victim's vehicle; (2) weaker DNA evidence associating Corey to the DNA sample taken from the victim's stomach; (3) eyewitness testimony identifying Corey at the scene; (4) additional eyewitness testimony consistent with Corey being the attacker; and (5) Corey's fuel records demonstrating his opportunity to commit the crimes."

"We hold based on our review of the entire record that the jury misconduct was harmless beyond a reasonable doubt." *Corey*, 304 Kan. at 734.

In its analysis of the harmless-error issue, the Kansas Supreme Court did note the fuel receipts as one part of the "overwhelming" evidence. In our view, though, the fuel receipts were properly listed last on the list of incriminating evidence. The strongest evidence by far was the DNA evidence, and it was supplemented by eyewitness testimony. Even without the fuel receipts, Corey's job as an over-the-road truck driver could have easily put him in Ottawa, a city on I-35. And Corey admitted that his equipment as a truck driver included gloves and stocking caps like those found in L.H.'s car—with his DNA on them. Corey has not shown either that Boyd's representation was constitutionally deficient or that any inadequacy in the representation affected the trial's outcome.

We therefore affirm the district court's judgment.

10