No. 94,244

STATE OF KANSAS, *Appellee,* v. WILLIAM DALE ALBRIGHT, *Appellant.*

(153 P.3d 497)

Opinion filed March 16, 2007.

*Christopher L. Hughes,* of Roger L. Falk & Associates, P.A., of Wichita, argued the cause and was on the brief for appellant.

*Lee J. Davidson,* assistant attorney general, argued the cause, and *Phill Kline,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: On this direct appeal from defendant William D. Albright's conviction of first-degree murder at retrial, defendant challenges the constitutionality of his hard 40 sentence, argues the dis-

trict judge erred in overruling his motions for a mistrial, and alleges prosecutorial misconduct during closing argument denied him a fair trial.

## Factual and Procedural Background

The facts underlying defendant's conviction are set out in detail in *State v. Albright*, 271 Kan. 546, 547-49, 24 P.3d 103 (2001), and are summarized as follows:

Defendant and David Barker, the victim, went to visit Jason Hoffine, who ran an auto repair shop. Defendant wanted two things—a new life in Mexico and money from Hoffine. Barker's wife and defendant's girlfriend decided to stay together in a motel because Barker's house had just been searched by police. The next day, the group met back at the motel. Barker and defendant talked about returning to Hoffine's to sell the Barkers' 1961 Chevrolet Impala for $2,000 cash. The two men went to Barker's house, picked up the car, returned to the motel about 7:30 p.m., and unloaded the car.

About 9:15 p.m., the two women left the motel. Barker's wife noticed that defendant had a 9-mm hand gun, which belonged to a friend, Stephen Jeffrey Phillips. Barker carried two guns and a pocketknife. Defendant and Barker left to talk to Hoffine about the Impala. The women returned to the motel about midnight; although the men were supposed to meet them, they did not return that night.

About 4 a.m., defendant unexpectedly arrived alone at Hoffine's house, driving the Impala. Defendant told Hoffine that he would take just about anything for the Impala, although days earlier, Barker had tried to convince Hoffine that the car had been appraised at $3,300. The car's ignition switch could be activated without a key. Defendant did not have the keys, but he had the unsigned title certificate. In Hoffine's presence, defendant forged Barker's signature on the title and sold the Impala to Hoffine, who then drove defendant back to the motel.

Defendant also fabricated a story that Hoffine believed he was supposed to repeat if questioned. According to the story, defendant and Barker had come to Hoffine's house about midnight, and Hof-

fine gave defendant some money. Barker left with a Mexican driving a blue Suburban.

In actuality, according to Hoffine's testimony, after defendant arrived at his house, defendant washed his hands and arms because he was concerned about "ballistics" testing. Then defendant told Hoffine that he had shot Barker in the back of the head while Barker stood behind the Impala about 26 miles outside of town. Defendant also said that he had left Barker's body lying beside the road and that the body should be found fairly soon.

Defendant and Phillips left for Oklahoma that evening. On the trip, defendant told Phillips that he had shot Barker in the head while Barker stood by the trunk of the Impala. Defendant also told Phillips that he had used Phillips' 9-mm Ruger and that he had dismantled the gun and disposed of it.

Phillips had two 9-mm Rugers that looked nearly identical. He testified that he had lent one of them to defendant. Defendant returned it 2 days before the murder, and Phillips had placed the gun in the kitchen drawer where defendant knew he usually kept it. When Phillips looked for the gun the next day, it was gone. The Ruger admitted into evidence at trial was not the one used to kill Barker; it was the other 9-mm Ruger owned by Phillips.

Phillips testified that defendant said he killed Barker because Barker was going to have Phillips and Phillips' mother, niece, and nephew killed. Defendant told him that Barker thought Phillips had called the police about raiding Barker's house. Phillips said he did not know about Barker's threats until defendant told him about them.

After a farmer found Barker's body lying in the middle of the road, an autopsy revealed that Barker died from a gunshot wound to the back of his head. Dr. Corrie May, a forensic pathologist, testified that, in her opinion, the death was a homicide. Forensic testing showed that tissue scraped from the rear quarter panel of the Impala was consistent with Barker's DNA.

Police found a .380 caliber bullet where the body was found. Phillips testified that he loaded both of his Rugers with 9-mm ammunition and did not have any .380 caliber ammunition in his

home. During a search of defendant's home, the police found .380 caliber ammunition.

A special agent from the Kansas Bureau of Investigation (KBI) testified that the tire impressions found at the scene were consistent with the Impala. Bootprints at the scene matched those worn by defendant and Barker. Barker's knife, two guns, and keys were found undisturbed on his body.

During the retrial leading to this appeal, despite pretrial rulings in defendant's favor on motions in limine, the prosecutor mentioned the prior trial. In addition, State expert Steve Koch made reference during his testimony to defendant's fingerprints being in the KBI central repository. After each incident, defense counsel moved for mistrial. The district judge rejected each motion.

During closing argument, the prosecutor stated:

"Now, defense has suggested to you over the last several days, ladies and gentlemen, that—a couple of things actually. Number one, that defendant could not have done it because of timing. And I will talk a little bit about the medical evidence in this case.

"The other thing, the other part of the defense is, well, it's kind of what's known as the SODDI defense. Some other dude did it. We'll see. It's been a suggestion that, oh well, other people could have done this. Well, reminds me of my favorite cartoon, if any of you read the Sunday comics. But I love Family Circus, always have. And I always thought it was funny, the kid and the 'not me' character. Whenever the kids' parents knew one of them had done something wrong and they're going 'not me' and the little 'not me' guy is running around. It's that phantom. It's that I don't have anything better to say, so it's not me.

. . . .

"Before I talk about Dr. Spitz—well, Dr. Spitz, you saw him on the stand. Credibility is for you to weigh, ladies and gentlemen. You saw him. He was evasive. He was antagonistic. It would have been nice to get an answer out of him, a straight answer. I think I only got maybe two or three.

"But I can't understand, if he is so confident in his conclusions, if he is such the expert, why be evasive? Why be antagonistic? Dr. May certainly wasn't. She was very straightforward. She was very calm. She was very cooperative. Wasn't she? Well, why is Dr. Spitz evasive? Because he is acting more as an advocate than an independent expert."

Upon defendant's conviction, the district judge found that defendant committed the crime for the purpose of receiving money

or any other thing of monetary value; thus the judge imposed a hard 40 sentence.

### Constitutionality of Kansas' Hard 40 Sentencing Scheme

Premeditated first-degree murder, committed in violation of K.S.A. 21-3401(a), carries a stated penalty of life imprisonment and requires that a defendant serve 25 years before he or she becomes eligible for parole. K.S.A. 1998 Supp. 22-3717(b)(1). Pursuant to K.S.A. 21-4635, the State may seek to increase the time before parole eligibility to 40 years, K.S.A. 21-4638, and the sentencing judge may impose the hard 40 sentence if he or she finds that one or more aggravating circumstances enumerated in K.S.A. 21-4636 exist and are not outweighed by mitigating circumstances. K.S.A. 21-4635(d); K.S.A. 21-4637. The decision on whether to impose a hard 40 sentence is allocated to the sentencing judge. K.S.A. 21-4635(a).

Defendant argues that the Sixth Amendment to the United States Constitution and the Kansas Constitution Bill of Rights, §§ 5, 10 require "that any fact which may increase the maximum penalty for a crime must be proven to a jury beyond a reasonable doubt," and that the hard 40 sentencing scheme violates these constitutional requirements.

This issue has no merit.

"Imposition of the K.S.A. 21-4638 hard 40 sentence based on a fact not found by the jury does not increase a defendant's maximum sentence of imprisonment for life imposed under K.S.A. 21-4706(c). The hard 40 sentence limits the lower end of the sentence. [A] hard 40 sentence violates neither the Due Process Clause of the United States Constitution, nor [the] right to trial by jury under the 6th Amendment to the United States Constitution or § 5 of the Kansas Constitution Bill of Rights." *State v. Conley,* 270 Kan. 18, Syl. ¶ 3, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001).

We have previously upheld the hard 40 sentencing scheme and *Conley* in light of each of the distinguishable United States Supreme Court cases, *Ring v. Arizona,* 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002), *Apprendi v. New Jersey,* 530 U.S. 466, 489-94, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and *Jones v. United States,* 526 U.S. 227, 143 L. Ed. 2d 311, 119 S. Ct. 1215

(1999), urged upon us by defendant. See, *e.g.*, *State v. Engelhardt*, 280 Kan. 113, 142-143, 119 P.3d 1148 (2005); *State v. Wilkerson*, 278 Kan. 147, 160, 91 P.3d 1181 (2004); *State v. Martis*, 277 Kan. 267, 297, 83 P.3d 1216 (2004); *State v. Boorigie*; 273 Kan. 18, 41-42, 41 P.3d 764 (2002); see also *State v. Hurt*, 278 Kan. 676, 686-88, 101 P.3d 1249 (2004); *State v. Hebert*, 277 Kan. 61, 108, 82 P.3d 470 (2004); *State v. Washington*, 275 Kan. 644, 680, 68 P.3d 134 (2003); *State v. Douglas*, 274 Kan. 96, 111-12, 49 P.3d 446 (2002), *cert. denied* 537 U.S. 1198 (2003); *State v. Boldridge*, 274 Kan. 795, 812, 57 P.3d 8 (2002), *cert. denied* 538 U.S. 950 (2003); *State v. Spain*, 263 Kan. 708, 713, 953 P.2d 1004 (1998); *State v. Gideon*, 257 Kan. 591, Syl. ¶ 3, 894 P.2d 850 (1995).

Specifically, defendant argues that our *Conley* decision relied on the United States Supreme Court's earlier decision in *McMillan v. Pennsylvania*, 477 U.S. 79, 91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986) (facts that do not increase defendant's punishment beyond that authorized by the underlying statute need not be proven to a jury beyond a reasonable doubt). He argues that *Ring, Apprendi*, and *Jones* called *McMillan* into doubt, making *Conley*'s reliance misplaced. We have previously rejected that specific argument as well, determining that the *Apprendi* Court refused to overturn *McMillan. State v. Hurt*, 278 Kan. 676, 687, 101 P.3d 1249 (2004); *State v. Albright*, 273 Kan. 811, 826, 46 P.3d 1167, *cert. denied* 537 U.S. 962 (2002); see also *Harris v. United States*, 536 U.S. 545, 567, 153 L. Ed. 2d 524, 122 S. Ct. 2406 (2002) ("Within the range authorized by the jury's verdict, however, the political system may channel judicial discretion—and rely upon judicial expertise—by requiring defendants to serve minimum terms after judges make certain factual findings.").

Defendant also cites as persuasive authority the cases of *People v. Swift*, 202 Ill. 2d 378, 781 N.E.2d 292 (2002), and *State v. Tafoya*, 91 Hawaii 261, 982 P.2d 890 (1999). Neither case is controlling, and both are distinguishable.

In *Swift*, the defendant was convicted of first-degree murder. Under Illinois law, the sentencing range for the crime was 20 to 60 years' imprisonment; defendant challenged an Illinois statute that permitted the sentence to be increased to 80 years based on

a factual finding by the judge, acting alone, that the crime was brutal and heinous. The Illinois Supreme Court determined that, under *Apprendi*, the sentence could not stand. 202 Ill. 2d at 392. Under Kansas law, the penalty for first-degree premeditated murder is life imprisonment; that penalty is not increased by the imposition of the hard 40 sentence.

In *Tafoya*, the Hawaii Supreme Court relied solely on state constitutional grounds to hold that, for purposes of enhancing sentences when elderly, handicapped, or minor victims are seriously injured in course of certain crimes, factual findings regarding victim's status and defendant's knowledge of that status must be made by the trier of fact. 91 Hawaii at 273. This case was decided prior to *Apprendi* and has no application here.

Defendant presents no new challenge to the statute and provides no compelling reason for this court to revisit its precedent.

### Motions for Mistrial

Prior to his new trial, the district court granted defendant's motion in limine to prevent the State from referring to either defendant's prior conviction or the prior trial of this case. The district court also granted defendant's motion in limine to prohibit admission of K.S.A. 60-455 evidence without a prior hearing.

Defendant alleges two violations of these orders—one when the prosecutor referred briefly to the prior trial and one when a State expert mentioned that defendant's fingerprints were in the KBI central repository—substantially prejudiced him and required the district court to grant his motions for mistrial. He argues that the district court abused its discretion by refusing to do so.

K.S.A. 22-3423(1)(c) gives a district court the discretion to terminate a trial and order a mistrial if "prejudicial conduct . . . makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution."

This court has often stated that a district court's ruling on a motion for mistrial is reviewed under an abuse of discretion standard. See *State v. Patton*, 280 Kan. 146, 181, 120 P.3d 760 (2005); *State v. Daniels*, 278 Kan. 53, 66, 91 P.3d 1147, *cert. denied* 543 U.S. 982 (2004). A court abuses its discretion when no reasonable

person would take the same view. *State v. Hebert,* 277 Kan. 61, 94, 82 P.3d 470 (2004). A defendant must show substantial prejudice before this court will find the district court abused its discretion in denying a motion for mistrial. *Patton,* 280 Kan. at 181; *Daniels,* 278 Kan. at 66-67.

We note that when a defendant alleges prejudice based on reviewing the district court's denial of a mistrial motion based on violations of an in limine order *by the prosecutor,* we have also employed a prosecutorial misconduct-type analysis to the extent it is helpful in determining whether there has been substantial prejudice. See *State v. Tosh,* 278 Kan 83, 93, 91 P.3d 1204 (2004) (two-part prosecutorial misconduct analysis); *State v. Gleason,* 277 Kan. 624, 641, 88 P.3d 218 (2004) (quoting *State v. Bloom,* 273 Kan. 291, 301, 44 P.3d 205 [2002]; *State v. Crume,* 271 Kan. 87, Syl. ¶ 11, 22 P.3d 1057 [2001]).

Prosecutor's Reference to Prior Trial

The district judge's pretrial order in limine permitted discussion of prior testimony but prohibited reference to the prior trial. During redirect, as the prosecutor attempted to refresh the recollection of a witness with testimony the witness had given at the first trial regarding the murder weapon, the prosecutor referred to the witness' "prior testimony" several times. However, the prosecutor then said: "Okay. And at the *previous trial* you were shown or previous testimony you showed—you were showed this same exhibit number 53." Defendant's counsel objected to the question out of the hearing of the jury and moved for a mistrial based on the prosecutor's violation of the motion in limine. The prosecutor admitted he had "slipped up" and apologized. The district court denied the motion for mistrial, finding that the mistake was inadvertent and concluding that there was no substantial prejudice. The judge offered a curative instruction, but defendant declined it.

While the prosecutor's mistake constituted a violation of the order in limine, it was inadvertent and isolated. The prosecutor immediately corrected his slip. No attention was drawn to the mistake, and the defense declined the judge's offer of a curative instruction. Under these circumstances, there was no substantial

prejudice, even if we measure its probability by the two steps used for alleged prosecutorial misconduct. Any misconduct was not gross or flagrant and did not appear to be the product of ill will or bad faith. We are confident the mistake had little weight in the minds of the jury. See *Gleason*, 277 Kan. at 641; see also *State v. Whitesell*, 270 Kan. 259, 281-82, 13 P.3d 887 (2000) (district court's denial of defendant's motion for a mistrial affirmed on appeal; "two minor statements" referencing first trial were inadvertent and had no prejudicial effect on the trial).

Expert's Testimony

We assess the likelihood of substantial prejudice arising from the State's fingerprint expert's mention of the KBI central repository in much the same way. The prosecutor asked, "Were you given any fingerprints from the defendant, Mr. Albright?" And the witness answered, "I—we—the KBI had a set of known fingerprints in our central repository." After a few more questions and answers, defense counsel approached the bench and objected to the testimony as a violation of the order in limine and as improper under K.S.A. 60-455. In the view of the defense, the fact that defendant's fingerprints were on file at the central repository implied he had previously been arrested. Again, the defense moved unsuccessfully for a mistrial. The district court then offered two options: (1) Striking of the answer and an instruction to the jury to ignore it; or (2) An opportunity for the defense to call a jailer as a witness to testify that defendant's prints were taken upon his arrest in this case. Defendant refused both options.

Again, we conclude that the district court did not abuse its discretion in determining that the witness' statement did not prejudice the defendant. The expert stated more than once that fingerprints are normally taken at the time of arrest. And the reference to the KBI central repository was subject to more than one interpretation; it did not inevitably suggest to the jury that defendant had a criminal record. Further, the State did not solicit or expect the statement; no further attention was drawn to it. See *State v. Rinck*, 256 Kan. 848, 853-54, 888 P.2d 845 (1995) (trial court did not abuse discretion in refusing to grant defendant mistrial after

defendant's accomplice testified during State's examination that defendant had previously been in prison; accomplice's statement was unsolicited; defendant refused court's offer to give limiting instruction; no further mention of defendant's record made during trial; under all the circumstances, statement could not have affected result).

## Prosecutorial Misconduct

This court's decision in *Tosh,* 278 Kan. 83, Syl. ¶¶ 1, 2, sets forth the governing two-step analysis for allegations of prosecutorial misconduct: it applies regardless of whether the alleged misconduct occurs during witness examination or during closing argument, and it applies even when no contemporaneous objection was made. *State v. Swinney,* 280 Kan. 768, 779, 127 P.3d 261 (2006); see *State v. Dixon,* 279 Kan. 563, 590-92, 112 P.3d 883 (2005); *State v. Overton,* 279 Kan. 547, 558-60, 112 P.3d 244 (2005); *Tosh,* 278 Kan. at 87-89 (cross-examination), 89-93 (closing argument).

The first step asks whether the complained-of conduct was outside the considerable latitude given a prosecutor in discussing the evidence. The second step asks whether the remarks constituted plain error, that is, whether the statements prejudiced the defendant and denied him or her a fair trial. *Dixon,* 279 Kan. at 590-91; see *Overton,* 279 Kan. at 558-59. The second step requires three factors to be considered: (1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors unless the harmless error tests of both K.S.A. 60-261 and *Chapman v. California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), have been met. *Swinney,* 280 Kan. at 779-80 (citing *Dixon,* 279 Kan. at 592; *Tosh,* 278 Kan. 83, Syl. ¶ 2).

Defendant argues that the prosecutor committed reversible misconduct by making two improper assertions during closing argument.

The "SODDI" Defense and "Not Me" Character

After discussing the evidence presented through testimony supporting the State's version of the events, the prosecutor mentioned the "SODDI" or "some other dude did it" approach of the defense, as well as the phantom character from the Family Circus comic, "Not Me." Defendant argues that these references went beyond the bounds granted a prosecutor in discussing evidence, and that the statements, by characterizing defendant's theory of defense as "imaginary" and "phantasmal," were analogous to "smoke screen" arguments that prejudiced his right to a fair trial.

As defendant acknowledges, we have never concluded that drawing an analogy between a defense tactic and "smoke" is inherently prejudicial, and we have not reversed based on such a statement alone. See *State v. Rodriguez*, 269 Kan. 633, 643-45, 8 P.3d 712 (2000) (prosecutor's comments in arson case, which involved burning a dog, to effect that defense counsel had attempted to divert jury's attention by arguing State did not know who dog's owner was, labeling of tactic was "puff of smoke" not prosecutorial misconduct; comments not beyond bounds of legitimate rhetoric; puff of smoke argument responsive to defense counsel's strained interpretation of evidence regarding defendant's beliefs about who, if anyone, owned dog); *State v. McCray*, 267 Kan. 339, 348-51, 979 P.2d 134 (1999) (prosecutor's "smoke screen" statement made in course of more egregious comments insinuating defense counsel's "deception" was attempt to "fool," "intimidat[e]," and "scare" jury; remarks outside bounds of proper argument but little likelihood they changed result); *State v. Duke*, 256 Kan. 703, 718-20, 887 P.2d 110 (1994) (prosecutor called defense closing argument "a lot of smoke," said "[i]t's smoke and mirrors . . . trying to confuse you"; no intent to mislead and within permissible bounds of rhetoric); *State v. Baker*, 249 Kan. 431, 447, 819 P.2d 1173 (1991) (prosecutor argued defendant's "nice boy image . . . [was] nonexistent," "[i]t's a smoke screen"; statements not gross nor flagrant, did not deprive defendant of fair trial); *City of Dodge City v. Ingram*, 33 Kan. App. 2d 829, 837-38, 109 P.3d 1272 (2005) (prosecutor's comments that defense "simply arguing smoke and mir-

rors" and "[g]rasping at straws," not improper, not outside wide latitude allowed in discussing evidence); *State v. Lockhart,* 24 Kan. App. 2d 488, 490-93, 947 P.2d 461, *rev. denied* 263 Kan. 889 (1997) (prosecutor's "smoke screen" argument noted but not found improper; basis for reversal in prosecutor's references to defendant and defense counsel as liars); see also *State v. Anthony,* 282 Kan. 201, 210-12, 145 P.3d 1 (2006) (approving prosecutor's colorful analogy of defense theory to the Wizard of Oz); *State v. Collier,* No. 93,589, unpublished Court of Appeals opinion filed March 31, 2006, *rev. denied* 282 Kan. 792 (2006), slip op. at 8-9 (simple "smoke and mirrors" comments not considered prosecutorial misconduct; even if improper, no prejudice).

On the contrary, we have approved a variety of colorful analogies used by prosecutors to describe the defense theory of such cases. Although we have not had occasion to address the two particular descriptors at issue here, we conclude there was nothing improper about the prosecutor's characterization of the defense theory as "the 'SODDI' defense," or her analogy to Family Circus and its "Not Me" character. A previous panel of our Court of Appeals specifically approved the "SODDI" reference. *State v. Mincks,* No. 93,187, unpublished opinion filed Nov. 18, 2005, slip op. at 10-11 (no misconduct in describing "SODDI" defense as "insidious."). Here, the description and analogy more or less accurately characterized the defense theory of the case. We conclude that these statements were within the wide latitude given a prosecutor in discussing the evidence.

Comments on Experts

Defendant also argues that the prosecutor committed reversible misconduct by commenting on the credibility of the defense pathology expert Dr. Werner Spitz, and comparing him to the State's own witness, May. After discussing May's testimony, the prosecutor characterized Spitz as "evasive" and "antagonistic."

A witness may not express an opinion on the credibility of another witness. *State v. Elnicki,* 279 Kan. 47, 53, 105 P.3d 1222 (2005); *State v. Jackson,* 239 Kan. 463, 470, 721 P.2d 232 (1986). This is because the determination of the truthfulness of a witness

is for the jury. *State v. Plaskett*, 271 Kan. 995, 1009, 27 P.3d 890 (2001). It also is error for a prosecutor to state his or her personal opinion concerning a witness' credibility.

Here, however, the prosecutor's references to defendant's expert as evasive and antagonistic and her own expert as "straightforward" and "cooperative" were not outside of the considerable latitude given a prosecutor in discussing the evidence. The prosecutor merely described witness demeanor, which is an observation not a judgment on credibility. In addition, defense counsel, in his closing, wholeheartedly agreed that "Dr. Spitz [was] cantankerous." Even the district court judge had said, out of the hearing of the jury, that "it would be nice if [Spitz would] just answer a question." Compare *Elnicki*, 279 Kan at 57-68 (prosecutor's comments during closing argument referring to defendant's "yarn," "fairy tale," "fabrication," "tall tale," and "spin" constitute improper opinion of defendant's credibility; statements that "you know [victim] was telling truth" and "truth shows you beyond a reasonable doubt the defendant is guilty" are improper; cumulative errors require reversal); *State v. Pabst*, 268 Kan. 501, 505-06, 996 P.2d 321 (2000) (reversible misconduct when prosecutor accused defendant of lying 11 times in closing argument, vouched for truthfulness of own witnesses; defendant's credibility crucial).

We also note that the challenged statements were made in the context of discussing inconsistencies between the medical opinions of the two experts, which the prosecutor has the latitude to do. See *State v. Finley*, 273 Kan. 237, 244-47, 42 P.3d 723 (2002). May had examined the body, performed the autopsy, and filed a report; Spitz had not had access to the body, had not reviewed the available materials, and had based his conclusion on only one slide. Finally, the jury also was admonished several times by the prosecutors, defense counsel, and the district court that credibility determinations were solely within its province.

Affirmed.