NOT DESIGNATED FOR PUBLICATION

No. 117,234

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

GARRET MOUNTON LEE,
*Appellant*.


MEMORANDUM OPINION


Appeal from Harvey District Court; JOHN B. KLENDA, judge. Opinion filed August 3, 2018. Affirmed in part, vacated in part, and remanded with directions.


*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.


*David E. Yoder*, county attorney, and *Derek Schmidt*, attorney general, for appellee.


Before ARNOLD-BURGER, C.J., POWELL and GARDNER, JJ.


PER CURIAM: Garret Mounton Lee appeals the district court's denial of his motion for mistrial, arguing his right to a fair trial was violated when a witness referenced his first jury trial during cross-examination and the district court did not give a cautionary jury instruction. Lee also asserts that the district court's imposition of lifetime postrelease supervision on his rape conviction—committed when he was 15 years old—constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution. While we agree with Lee that the imposition of lifetime postrelease supervision is unconstitutional according to binding precedent from the Kansas Supreme

1

Court, we vacate that portion of Lee's sentence but affirm the district court in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

T.F. was matched with Marti Lee through the Big Brothers, Big Sisters program when she was in kindergarten. What started as a school match—where the meetings only occurred at T.F.'s school—transitioned into a community match—where T.F. was allowed to visit Marti in the community and stay overnight at Marti's home in Newton. P.D., T.F.'s mother, described Marti and T.F.'s relationship as very close and similar to how a grandmother and a granddaughter would interact. Over the years, Marti helped T.F. with her homework, took her to parades and movies, and helped T.F. save money for a bowling ball and bike. In 2010, T.F. was nine years old, and the two met every Tuesday.

On June 8, 2010, T.F. stayed overnight at Marti's home. Marti's brother, Dan, and Dan's 15-year-old son, Lee, lived in a one-room apartment in her basement. That night, Marti, Lee, and T.F. were watching movies in the living room. Around 9:30 or 10 p.m., Marti decided to go to bed before the movie was over. Marti let T.F. finish watching the movie with Lee. Marti went to her bedroom down the hall and left her door open with her television on.

After Marti went to bed, Lee left the couch and laid down next to T.F. on some blankets and pillows that were on the floor. During the movie, Lee turned T.F. on her side with her bottom nearest him and pulled down her pajama pants and underwear. T.F. testified that Lee then "put his private in [her] butt," which she later described as feeling hard and wet. T.F. said "ouch" and scooted away. She pulled up her pants and continued watching the movie. Lee then turned T.F. on her other side facing him, pulled down her pants and underwear again, and "put his private in [her] private." T.F. referred to both

2

vagina and penis as a "private." T.F. said she felt his private inside her and again described it feeling hard and wet. T.F. stated she felt scared, so she ran to the bathroom, wiped herself, flushed the toilet, and went to bed.

The next morning, Marti woke up T.F., but T.F. did not tell her what happened. T.F. remembered Marti dropping her off at home. A few days later, T.F. told her best friend and neighbor what had happened and asked her not to tell anyone. T.F.'s friend waited about a day then told her mother, Nikki Robinson, that T.F. told her a secret that Lee had forced himself onto T.F. Nikki wanted to tell P.D. that night, but P.D. was already asleep.

On June 13, 2010, Nikki told P.D. that T.F. was inappropriately touched by Lee at Marti's on Tuesday. Nikki told P.D. that T.F. had said it was a secret and did not want anyone to know. Later that night, P.D. asked T.F. to go with her to get groceries. While driving, P.D. asked T.F. what happened at Marti's that Tuesday. T.F. eventually told P.D. that Lee touched her and she got scared but did not want anyone to know because she did not want to lose Marti.

That night, P.D. took T.F. to the Newton Medical Center emergency room. Hospital staff notified the police, and Officer Mitchell Nedrow was dispatched to the hospital. P.D. told Nedrow that she believed her nine-year-old daughter was a victim of a sex offense. According to Nedrow, P.D. told him that T.F. said Lee had taken off her pants, grabbed her bottom, and "put his balls inside of her." Nedrow did not talk with T.F. in detail because he was not certified to investigate child sex offenses. Because Newton did not have a sexual assault nurse on staff and five days had passed since the assault, the doctors told P.D. there was nothing they could do. Nedrow referred P.D. to St. Joseph or Wesley Medical Center in Wichita to have T.F. undergo a sexual assault examination.

On June 15, 2010, P.D. took T.F. to get an exam in Wichita. Ruthann Farley, a registered nurse and nationally certified sexual assault nurse examiner (SANE), conducted a long-term sexual assault examination on T.F. Farley completed the long-term exam because four to five days had passed since the assault and body swabs do not typically collect evidence. During the exam, T.F. told Farley what happened, and Farley examined T.F.'s genital areas. Farley did not find any acute or healed injury on T.F.'s vagina or anus. Farley testified at trial that the SANE program sees injuries in about 30-40% of cases, and because the genital tissues heal quickly the lack of an injury is not determinative of whether a sexual assault occurred. On June 18, 2010, Newton Police Detective Craig Douglass conducted a video-recorded interview of T.F. at the local child advocacy center.

Douglass testified that he interviewed Lee at the Newton Police Department on June 21, 2010. He contacted Lee's father to bring in Lee to talk with him. During the interview, Lee told Douglass that a school resource officer had contacted his dad a week before, so he knew why he was there. Lee said that on June 8, 2010, he was watching a movie in the living room with T.F.; he was sitting in a chair, and T.F. was on the floor on some pillows and blankets. Lee stated that at one point during the movie, T.F. complained about stomach pain and asked for medicine. Lee was not sure if he could give T.F. medicine, and then he had a nosebleed from a migraine. Lee said that he ran down to the basement to clean up his nose and get some medicine. He went back upstairs to tell T.F. to go to bed which made her mad because he had originally told her he was going to stay up later, and then he went to bed in the basement. Lee told Douglass that he did not inappropriately touch T.F.

In August 2011, the State charged Lee as a juvenile with one count of rape under K.S.A. 2010 Supp. 21-3502(a)(2) and one count of aggravated criminal sodomy under K.S.A. 2010 Supp. 21-3506(a)(1). In October 2013, the district court granted the State's

4

motion to prosecute Lee as an adult. In April 2015, Lee's first jury trial ended with a deadlocked jury.

A second jury trial was held in October 2015. In addition to the above testimony, Michelle Mitts, T.F.'s babysitter, testified that she took care of T.F. the morning of June 9, 2010; she did not notice any changes in T.F.'s behavior, and T.F. seemed happy to talk about her visit at Marti's the night before. T.F. testified that she did not tell Marti the next morning, did not remember seeing Mitts the next day, and did not recall Lee having a nosebleed the night of the incident. Marti testified that on the Monday after T.F.'s visit, P.D. phoned her and informed her that Lee had molested T.F. She was terminated from the Big Brothers, Big Sisters program the next day. P.D. and T.F. testified that the sexual assault examination and losing Marti were traumatic events in T.F.'s life. Several witnesses testified that T.F. changed from a bubbly and happy girl to withdrawn and quiet.

Lee testified and denied the allegations against him. The defense also admitted a Big Brothers, Big Sisters progress report that was completed on the Thursday following T.F.'s visit at Marti's, where T.F. and P.D. did not report anything negative about T.F.'s match with Marti.

Dan testified that on the evening of June 8, 2010, he was primarily in the basement watching television. He went upstairs around 10 p.m. to check his e-mails. Dan stated that Lee was sitting in a chair in the living room and that T.F. was also there watching a movie. After 15 to 20 minutes, Dan told Lee to go to bed soon because he had football practice in the morning. Dan went to the basement and was reading on his bed when Lee ran loudly down the stairs about 5 to 10 minutes later with a nosebleed and went into the bathroom. Dan checked the stairwell to make sure Lee did not get blood on the stairs. Dan told Lee to go turn off the TV upstairs, which Lee did; Lee returned about two or three minutes later and went to bed.

The jury convicted Lee of rape and acquitted him of aggravated criminal sodomy. Before sentencing, Lee moved for a downward durational departure. At the sentencing in February 2016, the State argued and the district court noted that Lee was subject to lifetime postrelease supervision. The district court denied Lee's motion for departure, sentenced him to 155 months in prison, and advised that he had a lifetime registration requirement but did not state on the record that Lee was sentenced to lifetime postrelease supervision. The journal entry, however, included lifetime postrelease supervision in Lee's sentence.

Lee timely appeals.

I.      DID THE DISTRICT COURT ABUSE ITS DISCRETION IN DENYING LEE'S MOTION FOR MISTRIAL?

Lee first argues the district court violated his right to a fair trial by denying his motion for mistrial based on a witness' reference to his first jury trial during his second trial.

We review a district court's ruling on a motion for mistrial under an abuse of discretion standard. *State v. Corey*, 304 Kan. 721, 730, 374 P.3d 654 (2016).

> "Judicial discretion is abused when judicial action is (1) arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. [Citation omitted.]" 304 Kan. at 730-31.

With regard to a district court's decision to grant a mistrial,

"""Under K.S.A. 22-3423(1)(c), a trial court may declare a mistrial if there was prejudicial conduct either inside or outside the courtroom that makes it impossible for the trial to proceed without injustice to either the defendant or the prosecution. This statute creates a two-step process. First, the trial court must determine if there was some fundamental failure of the proceeding. If so, the trial court moves to the second step and assesses whether it is possible to continue without an injustice. In other words, the trial court must decide if the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial.

"""In *Ward*, our court articulated this standard by dividing the appellate court's abuse of discretion inquiry into two parts, asking: (1) Did the trial court abuse its discretion when deciding if there was a fundamental failure in the proceeding? and (2) Did the trial court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice? [Citations omitted.]""" *State v. Sean*, 306 Kan. 963, 987-88, 399 P.3d 168 (2017).

Under the first step of the process, "[t]he fundamental failure analysis varies with the nature of the alleged deficiency, *i.e.*, whether it is based on a witness' actions, a bystander's actions, prosecutorial error, or an evidentiary error." *Corey*, 304 Kan. at 731.

The Kansas Supreme Court has explained that "'[a]n appellate court reviewing the second step for an injustice will review the entire record . . . .' [T]he appellate court's review is a harmlessness inquiry, even though abuse of discretion has been articulated as the nominal standard of review. [Citations omitted.]" 304 Kan. at 731.

"When determining if a fundamental failure made it impossible to proceed without injustice, a court must assess whether the failure affects a party's substantial rights—in other words, whether it will or did affect the trial's outcome. 'The degree of certainty by which the court must be persuaded that the error did not affect the outcome

7

of the trial will vary depending on whether the error implicates a right guaranteed by the United States Constitution.' If it does not, the court will use the statutory harmless error standard of K.S.A. 60-261 and K.S.A. 60-2105. If it does, the court will use the constitutional harmless error analysis of *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987.

. . . .

"The level of certainty in the trial's outcome required under the nonconstitutional and constitutional harmless error tests are distinct. For nonconstitutional error, the [trial] court applies K.S.A. 60-261 and determines '"if there is a reasonable probability the error did or will affect the outcome of the trial in light of the entire record."' But for constitutional error, the court applies the test articulated in *Chapman*, under which an error may be declared harmless only when it is demonstrated beyond a reasonable doubt the error will not or did not affect the trial's outcome in light of the entire record, *i.e.*, when there is no reasonable possibility the error contributed to the verdict. Under either test, the party benefitting from the error bears the burden of demonstrating harmlessness. [Citations omitted.]" 304 Kan. at 731-32.

A.    *The motion for mistrial*

The motion for a mistrial stemmed from P.D.'s reference to Lee's first jury trial during cross-examination:

"Q. [Defense counsel] The other questions on that match worksheet, are they consistent with answers you would have given on June 10th of 2010?

"A. [P.D.] A couple of them, yes.

"Q. And a couple of them are not?

"A. There's one that definitely is not.

"Q. What is that?

8

"A. It says any major changes in the family which would include marriage, work, address, phone, absent parent, counseling. It says that I reported I was dating a guy I worked with and in parenthesis it says two months, and at that point in time, *as I stated in the first jury trial*, I was actually dating a guy I had later on married I did not work with.

"THE COURT: We're going to stop at this time. Ladies and gentlemen, I'm going to ask you to step out for a minute if you would, please."

Outside the jury's presence, the district court inquired whether the parties had instructed the witnesses not to mention Lee's first trial. Lee's counsel stated the defense witnesses were instructed. The State indicated that it was discussed, but P.D. disclosed she was not aware of a limitation. The district court admonished P.D. not to mention Lee's prior trial and stated that P.D. had referenced a prior trial twice in her testimony but that the jury may be unaware it related to Lee's case. The court also inquired how Lee wanted to proceed and whether he would like a cautionary instruction given to the jury. A recess was granted to give Lee time to confer with his counsel.

After the recess, Lee stated P.D. mentioned his prior jury trial twice and Nikki had referenced the prior trial once during her testimony. Our review of the trial transcript of Nikki's testimony fails to show any reference to Lee's prior trial, but P.D. previously mentioned the prior trial when she stated that she had seen a document at "the last jury trial." Neither party objected.

Lee moved for a mistrial, asserting that the jury should not be aware that there was a previous jury trial in this case. In response, the State argued that Lee's counsel invited P.D. to reference the prior jury trial with open-ended questions but that the references were brief and an admonishment to the jury and the State's witnesses would be sufficient.

The district court agreed and denied Lee's motion for mistrial. It found that Lee's counsel had, in part, invited P.D.'s disclosure with open-ended questions and that a

9

mistrial was not warranted because the two references to the first jury trial were brief and did not necessarily inform the jury that the prior trial had occurred in this case. The district court admonished P.D. not to make any further reference to the prior trial and had her leave the chambers. After further discussion, the district court asked Lee if he would like an admonishment to the jury and informed him that it would willingly instruct the jury that it was "not to draw any inference from the fact that [P.D.] may have testified in another jury trial concerning the guilt or innocence of Mr. Lee." Lee's counsel declined in order to avoid bringing more attention to the issue, and Lee himself declined the admonishment. The district court also informed Lee that he would be allowed to request an additional instruction at the instructions conference, if he preferred.

1.      *Did the motion for mistrial involve an evidentiary error?*

Here, the alleged deficiency occurred when a witness referenced Lee's first trial during his retrial. Lee frames the issue as whether the jurors' knowledge of the fact that this was Lee's second jury trial violated his right to a fair trial.

Lee asserts that P.D.'s reference to his first jury trial is similar to the deficiency under review in *Corey*. In *Corey*, our Supreme Court reviewed a trial court's denial of a motion for mistrial when a juror mentioned during deliberations that the proceedings were a retrial. Our Supreme Court agreed with this court's holding that there was a fundamental failure in the proceedings because "juror misconduct ordinarily occurs when a jury considers matters outside the evidence and the issues in the case and that the information about a retrial in Corey's case was a matter completely outside the evidence." 304 Kan. at 732.

Lee's reliance on *Corey* is misplaced, however, because "[t]he fundamental failure analysis varies with the nature of the alleged deficiency." 304 Kan. at 731. While the subject matter of the evidence under review is similar—referencing a first trial in a

10

retrial—Lee's motion for mistrial did not involve juror misconduct. The prejudicial conduct alleged here involved a witness' testimony during cross-examination; thus, Lee's motion for a mistrial involves a challenge to an evidentiary error.

2.    *Did Lee preserve the evidentiary issue for appeal?*

As a preliminary matter, we note that Lee's failure to timely object to P.D.'s testimony complicates our review. K.S.A. 60-404 requires that "[a] verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." In other words, "evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial." *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). "Our Supreme Court has consistently refused to 'review an evidentiary issue without a timely and specific objection even if the issue involves a fundamental right.'" *State v. Ratley*, No. 113,878, 2016 WL 4413325, at *3 (Kan. App. 2016) (unpublished opinion) (quoting *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 [2010]), *rev. denied* 306 Kan. 1328 (2017).

Lee did not object to P.D.'s first reference to his prior jury trial. Lee also fails to acknowledge on appeal his failure to object or comply with Supreme Court Rule 6.02(a)(5) (2018 Kan. S. Ct. R. 34) by explaining why his challenge to P.D.'s first reference is properly before this court. Our Supreme Court has emphasized that "Rule 6.02(a)(5) means what it says and is ignored at a litigant's own peril." *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015).

Lee also did not object to P.D.'s second reference to his first jury trial. Rather, the district court stopped the proceedings. After a brief recess, Lee then moved for a mistrial and argued that the jury should not be aware that there was a previous jury trial in this

case. Given the district court's intervention and Lee's subsequent motion for a mistrial, we find that Lee has sufficiently preserved for appeal our consideration of the district court's denial of his motion for mistrial based on P.D.'s second reference to his first jury trial.

3.     *Did the district court find that the evidentiary error was a fundamental failure?*

Next, the district court did not expressly state that P.D.'s reference to Lee's first trial was a fundamental failure. However, through a review of a district court's reasoning, we may assume that a district court determined a fundamental failure occurred, particularly if the district court offered to provide a jury admonishment or limiting instruction. See *Sean*, 306 Kan. at 989.

In *Sean*, our Supreme Court concluded that the trial court found a witness' testimony discussing Sean's gang affiliation in violation of the parties' agreement was a fundamental failure, based principally on the State's violation of the parties' agreement that no evidence of gang affiliation would be admitted but secondarily on the trial court's admonishment to the parties and the offer to admonish or to give a limiting instruction to the jury. The Supreme Court explained that a trial court's offers to admonish or give a limiting jury instruction support an assumption that the trial court found a fundamental failure "[b]ecause this step is necessary only when there was a fundamental failure in the trial." 306 Kan. at 989; see *State v. Longbine*, No. 114,611, 2016 WL 7429305, at *4 (Kan. App. 2016) (unpublished opinion) (holding trial court's stated reasoning and offer to give curing instruction suggested trial court found order in limine violation was fundamental failure), *rev. denied* 306 Kan. 1326 (2017).

The district court's actions and offers to admonish or give a cautionary instruction to the jury suggest it found P.D.'s reference to Lee's first trial was a fundamental failure. Although neither party objected, the district court sua sponte stopped the proceedings and

12

excused the jury from the courtroom. The district court also admonished P.D. and offered to give a cautionary jury instruction. After a short recess, the district court denied Lee's motion for mistrial but again admonished P.D. and offered to admonish the jury and give a curative jury instruction. Lee declined each offer. Accordingly, we find the district court considered P.D.'s reference to the first trial as a fundamental failure. See *Sean*, 306 Kan. at 989.

But even the existence of a fundamental failure is not determinative of whether the district court should have granted a mistrial. Rather, the second step requires us to decide whether the deficiency made it impossible for the district court to continue with the proceedings without denying the parties a fair trial. See *State v. Warren*, 302 Kan. 601, 608, 356 P.3d 396 (2015).

4.      *Did the district court abuse its discretion when deciding the potential prejudice could be mitigated?*

Under the second step, "we decide whether the [district] court abused its discretion in concluding that any potential prejudice from the fundamental failure could be mitigated." *Sean*, 306 Kan. at 989. In *Corey*, 304 Kan. at 731, our Supreme Court stated that although an abuse of discretion was the nominal standard under the second step, "the appellate court's review is a harmlessness inquiry." "Under either test, the party benefitting from the error bears the burden of demonstrating harmlessness." 304 Kan. at 732.

Lee argues that based on *Corey*, the constitutional harmlessness standard applies and the State bears the burden of proving that the fundamental failure did not affect the outcome of his trial beyond a reasonable doubt. In response, the State argues that Lee incorrectly asserts that it has a burden to prove the district court did not err in denying the motion for mistrial.

13

First, the State points to no authority suggesting our Supreme Court is departing from its holding in *Corey* requiring a harmlessness review. "It is well established that our court is duty bound to follow Kansas Supreme Court precedent unless we discern some indication the Supreme Court is departing from its prior precedent." *State v. Hadley*, 55 Kan. App. 2d 141, 154, 410 P.3d 140 (2017). However, in *Sean*, 306 Kan. at 990, our Supreme Court held that the trial court did not abuse its discretion under the second step—without using a harmlessness inquiry. Although our Supreme Court has shown some tendency to depart, we conclude that the State has the burden of demonstrating that the deficiency here, if any, was harmless.

Lee argues the constitutional standard under *Corey* applies. But as we have previously indicated, we find the present case distinguishable—and the constitutional standard inapplicable—because *Corey* involved juror misconduct. There, a juror introduced evidence from outside the trial proceedings, i.e., not admitted at trial, during deliberations. Our Supreme Court held that the juror misconduct impacted Corey's rights under the Sixth Amendment to the United States Constitution:

> "Jury misconduct under these circumstances must be viewed under the *Chapman* constitutional harmless error standard. 'In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the "evidence developed" against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.' 'Jury exposure to facts not admitted during trial violates the sixth amendment right to trial by jury by permitting evidence to reach the jury which has not been subjected to confrontation or cross-examination and to which counsel has not had the opportunity to object or request a curative instruction.' [Citations omitted.]" 304 Kan. at 732-33.

In this case, however, P.D. referred to Lee's first jury trial during cross-examination. Lee had the opportunity to assert his Sixth Amendment rights at that time.

In addition, the district court stopped the proceedings and provided Lee with the opportunity to determine how to address the testimony. Thus, the reasoning in *Corey* does not require that the constitutional harmlessness test applies in this case.

But even under the constitutional standard, there is no reasonable possibility that P.D.'s brief reference to Lee's first jury trial contributed to the verdict. P.D.'s reference was brief and inadvertent in the context of the entire trial, and the district court concluded that any taint from P.D.'s reference to Lee's first jury trial was curable through a jury admonition or instruction. The district court did not abuse its discretion in making this determination.

Kansas courts have considered similar appeals to a trial court's denial of a mistrial motion based on a violation of an order in limine. "The primary purpose of an order in limine . . . is to prevent prejudice during trial." *State v. Santos-Vega*, 299 Kan. 11, 25, 321 P.3d 1 (2014). To obtain an order in limine, a party must show the trial court that "the mere offer or reference to the excluded evidence would tend to be prejudicial." 299 Kan. at 25.

In *State v. Whitesell*, 270 Kan. 259, 13 P.3d 887 (2000), the defendant appealed the denial of his mistrial motion after two witnesses violated an order in limine prohibiting any reference to the first trial at a retrial. Specifically, one witness responded to a question on cross-examination about the preliminary hearing with: "'I thought you were talking about the first trial, that I had the—the notes from the first trial.'" 270 Kan. at 281. A second witness stated in response to a question "on cross-examination that he did not know that his photographs . . . had not turned out 'until our first case with this, first trial.'" 270 Kan. at 281-82. Despite the witnesses violating an order in limine, our Supreme Court held the district court's denial of Whitesell's motion for a mistrial was not an abuse of discretion because "[b]oth statements were inadvertent and had no prejudicial

15

effect on the trial" and Whitesell had not met "his burden of proof in showing that the statements prejudiced his right to a fair trial." 270 Kan. at 282.

In *State v. Albright*, 283 Kan. 418, 426, 153 P.3d 497 (2007), the prosecutor violated an order in limine while attempting to refresh a witness' testimony from the first trial: "'Okay. And at the *previous trial* you were shown or previous testimony you showed—you were showed this same exhibit number 53.'" Outside the jury's hearing, defense counsel moved for a mistrial, and the prosecutor apologized and admitted to the error. The district court denied the motion upon finding the reference was inadvertent, did not result in substantial prejudice, and offered to give a curative instruction which the defendant denied. Our Supreme Court affirmed and held that the district court did not abuse its discretion: "While the prosecutor's mistake constituted a violation of the order in limine, it was inadvertent and isolated. The prosecutor immediately corrected his slip. No attention was drawn to the mistake, and the defense declined the judge's offer of a curative instruction." 283 Kan. at 426.

Although based on different standards, the *Whitesell* and *Albright* cases are comparable to this case. When viewed in context of the entire trial, there is no reasonable possibility P.D.'s brief reference to Lee's first jury trial contributed to the verdict. The jury heard testimony from several witnesses over the course of the three-day trial. The trial came down to Lee's and T.F.'s credibility, and the jury had the opportunity to hear and weigh each person's prior statements and testimony. There was not a formal order in limine in effect when P.D. referenced Lee's first jury trial, and P.D.'s reference to Lee's first jury trial was a brief, minor statement in the context of the trial as a whole. The district court did not bring further attention to the error, admonished P.D. not to mention the first trial any further, and offered to admonish the jury and provide a cautionary instruction. Lee declined the trial court's offers.

Lee's argument on appeal that the district court erred in not providing a jury admonition or cautionary instruction despite Lee's rejections of the court's offers is without merit. In declining the offers, Lee's trial counsel stated that he did not want to draw further attention to the issue and that an instruction or jury admonition would do more harm than good. Moreover, P.D. did not disclose the outcome of the first trial, which courts have generally found more prejudicial than a witness' disclosure that a prior trial has occurred. See *Corey*, 304 Kan. at 733-34 (discussing out-of-state cases finding jury learning prior trial resulted in defendant's conviction more prejudicial than jury only learning that prior trial occurred). See also *State v. Watkins*, 152 Idaho 764, 766-67, 274 P.3d 1279 (2012) (listing supporting caselaw and reasoning that witness testimony disclosing that prior trial resulted in conviction more prejudicial than witness' testimony at retrial referencing "prior trial" and "the appeals court"); *People v. Krueger*, 296 P.3d 294, 310 (Colo. App. 2012) (caselaw provides mistrial warranted when witness testimony discloses prior conviction but not warranted when only references prior trial); *Brown v. State*, 153 Md. App. 544, 569-74, 837 A.2d 956 (Md. Ct. Spec. App. 2003) (same).

In conclusion, when viewing the entire record, there is no reasonable possibility that P.D.'s brief reference to Lee's first jury trial contributed to the verdict. Thus, the district court did not abuse its discretion in concluding that a jury admonishment or cautionary instruction could mitigate the prejudice and did not err in denying Lee's motion for mistrial.

II.   IS THE IMPOSITION OF LIFETIME POSTRELEASE SUPERVISION FOR CONVICTION OF A JUVENILE SEX OFFENSE UNCONSTITUTIONAL?

Lee argues for the first time on appeal that the district court's imposition of lifetime postrelease supervision for his conviction of rape constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution. A challenge under the Eighth Amendment is a question of law over which we exercise unlimited

review. *State v. Dull*, 302 Kan. 32, 40, 351 P.3d 641 (2015), *cert. denied* 136 S. Ct. 1364 (2016). The State concedes that the sentence is unconstitutional.

Generally, a party cannot raise a constitutional issue for the first time on appeal. *State v. Gomez*, 290 Kan. 858, 862, 235 P.3d 1203 (2010). But we recognize three exceptions to the general rule:

> "'(1) The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) the district court is right for the wrong reason.' [Citations omitted.]" 290 Kan. at 862.

A party who raises a claim for the first time on appeal is required to explain why this court should consider the claim. *Godfrey*, 301 Kan. at 1044; Kansas Supreme Court Rule 6.02(a)(5). Lee correctly asserts that our Supreme Court previously addressed a similar claim—the imposition of lifetime postrelease supervision on a juvenile convicted of a sex offense—raised for the first time on appeal, finding that because such challenges were not fact-specific and generally raised questions of law, "a categorical proportionality challenge may be raised for the first time on appeal." *Dull*, 302 Kan. at 39. As Lee has raised the same issue here, we may consider the merits of his constitutional challenge.

K.S.A. 2010 Supp. 22-3717(d)(1)(G)—the statute in effect at the time Lee committed his crime—requires the imposition of lifetime postrelease supervision following a conviction of rape, a sexually violent crime. The parties agree the district court's imposition of lifetime postrelease supervision for Lee's conviction for rape is unconstitutional under the Kansas Supreme Court's decision in *Dull*, 302 Kan. 32, Syl. ¶ 8: "Mandatory lifetime postrelease supervision is categorically unconstitutional under *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), when

imposed on a juvenile who committed and was later convicted of aggravated indecent liberties with a child."

Other panels of this court have applied the *Dull* court's reasoning not only to juveniles convicted of aggravated indecent liberties with a child but also to all juveniles convicted of a sex offense. See *State v. Medina*, 53 Kan. App. 2d 89, Syl. ¶ 2, 384 P.3d 26 (2016), *rev. denied* 306 Kan. 1327 (2017); *State v. Martinez-Lopez*, No. 114,179, 2017 WL 383363, at *5 (Kan. App. 2017) (unpublished opinion), *rev. denied* 307 Kan. 991 (2018); *State v. Allen*, No. 114,460, 2016 WL 6024528, at *5 (Kan. App. 2016) (unpublished opinion). Thus, the imposition of mandatory lifetime postrelease supervision is categorically unconstitutional and constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution as applied to all juveniles convicted of a sex offense.

As a remedy, the State suggests that Lee need not be resentenced and that the illegal portion of Lee's sentence reflected in the journal entry may be simply vacated and corrected through an amended journal entry or nunc pro tunc order. We agree because "[a] criminal sentence is effective upon pronouncement from the bench . . . [and] does not derive its effectiveness from the journal entry. A journal entry that imposes a sentence at variance with that pronounced from the bench is erroneous and must be corrected to reflect the actual sentence imposed." *Abasolo v. State*, 284 Kan. 299, Syl. ¶ 3, 160 P.3d 471 (2007). Here, the district court sentenced Lee to serve 155 months in prison but made no mention of imposing lifetime postrelease supervision from the bench. However, the written journal entry placed Lee on lifetime postrelease supervision. Our Supreme Court addressed a similar situation in *State v. Mason*, 294 Kan. 675, 677, 279 P.3d 707 (2012), and ordered the district court to prepare a nunc pro tunc order correcting the written journal entry. The same should be done here.

Lee's convictions are affirmed as is the sentence imposed by the district court from the bench. But because the journal entry erroneously included lifetime postrelease supervision, we vacate that part of the journal entry and remand with directions to the district court to issue a nunc pro tunc order correcting that portion of the sentence in the journal entry.

Affirmed in part, vacated in part, and remanded with directions.